605 F.Supp. 1270 (1985)
CREST TANKERS, INC., and Clayton Tankers, Inc., Plaintiffs,
v.
NATIONAL MARITIME UNION OF AMERICA, Defendant.
No. 83-1481C(1).
United States District Court, E.D. Missouri, E.D.
April 4, 1985.
*1271 Thomas M. Hanna, St. Louis, Mo., for plaintiffs.
Robert Bogard, St. Louis, Mo., Ned R. Phillips, New York City, Sandor Korein, East St. Louis, Ill., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
This case was tried to this Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

A. FINDINGS OF FACT
1. Crest Tankers, Inc. (hereinafter "Crest") is a Missouri corporation and a wholly-owned subsidiary of Apex Holding Co. (hereinafter "Apex Holding"). Clayton Tankers, Inc. (hereinafter "Clayton") is a Missouri corporation and a wholly-owned subsidiary of Apex Holding. Clayton is engaged in the ownership of United States flag vessels and Clayton's vessels are operated by Crest under contract. Crest is engaged in the ownership and operation of United States flag vessels on the high seas.
2. Trinidad Corp. (hereinafter "Trinidad") is a Delaware corporation and a wholly-owned subsidiary of Apex Shipping, Inc. (hereinafter "Apex Shipping"), which, in turn, is a wholly-owned subsidiary of Apex Holding. At all relevant times herein, Trinidad had offices in Philadelphia, Pennsylvania; Long Beach, California; and Clayton, Missouri. Trinidad engaged in the ownership and operation of United States flag vessels, including vessels of the Military Sealift Command of the United States Navy.
3. Apex Holding is a wholly-owned subsidiary of Apex Oil Co. (hereinafter "Apex Oil"). Apex Oil is a partnership that owns approximately 60 companies. The business of Apex Oil can be generally described as that of "oil traders". Oil traders make a profit by purchasing oil at a low price in one part of the world and transporting it to another part of the world to sell at a higher price.
4. On a flow chart, the corporate relationship of Apex Oil, Apex Holding, Apex Shipping, Trinidad, Clayton and Crest, is, as follows:
 APEX OIL
 APEX HOLDING
 APEX SHIPPING
 CREST CLAYTON
 TRINIDAD
5. Trinidad was purchased by Apex Shipping in January, 1981. By the summer of 1982, Trinidad owned, inter alia, five (5) tanker vessels outright, all of which were under continuous voyage charters to Apex Oil. At that time, Trinidad was the only Apex Oil subsidiary operating American-Flag tankers. Each of these had a capacity of 26,000 long tons. In addition, Trinidad was operating, under a management contract, two ships, the "Allegiance" and the "Banner", which were owned by Grand Bassa Tankers, Inc. Under said management agreement, Trinidad had the right of *1272 first refusal at any given price to purchase the Allegiance and the Banner.
6. The National Maritime Union (hereinafter "NMU") is a "labor organization" within the meaning of § 152(5) of the Labor Management Relations Act, as amended (hereinafter "LMRA"), 29 U.S.C. § 152(5). NMU is the collective bargaining representative of the unlicensed sea-going personnel of Trinidad. NMU and Trinidad are parties to a multi-employer collective bargaining agreement covering said unlicensed sea-going personnel. Said contract between Trinidad and NMU was effective June 16, 1981, through June 16, 1984. NMU and its duly authorized agents maintain an office in Granite City, Illinois, and do business in St. Louis, Missouri.
7. The collective bargaining agreement between Trinidad and NMU provides, in pertinent part, as follows:
The company in entering into this Agreement hereby recognizes the Union as the sole collective bargaining agent for the Unlicensed Personnel employed aboard all vessels of the Company where the Company also recognizes the Union as such agent. The Company also recognizes the Union as the sole collective bargaining agent for the Unlicensed Personnel employed by the Company on board all U.S. Flag oceangoing vessels including, but not limited to passenger, freighter, bi-cargo, tanker and bulk carriers, which are owned or operated (both at present or at any time during the life of this Agreement), by the Company or any of its subsidiaries or affiliates (whether so at present or at any time during the life of this Agreement), except those companies and vessels already covered by another AFL-CIO Maritime Union, as an owner, as an agent, as a General Agent of the United States, or under bareboat charter....
The term "subsidiaries" or "affiliates" shall be deemed to include any business entity whether corporate, partnership, trust or individual which is effectively controlled by or effectively controls the Company either directly or indirectly.
The Union may in its discretion at any time require that any such subsidiary or affiliate execute this Agreement and a refusal to do so will give the Union the right upon a 10-day written notice to the Company to cancel this Agreement. The failure of the Union to request a subsidiary or affiliate to sign this Agreement shall not in any way affect the obligation of the Company herein that this Agreement does cover and include all unlicensed personnel on all the vessels described above whether owned or operated by the Company or any of its subsidiaries or affiliates.
Article I, Section 1 (emphasis added).
8. Crest was organized on or about September 15, 1982, and began to make preparations for the ownership and operation of United States flag vessels on the high seas. Crest's first employee was William McHenry, who was hired on September 1, 1982, as Crest's fleet manager. Immediately prior to his employment by Crest, Mr. McHenry was a port captain and operations manager for Trinidad. When Mr. McHenry moved from Trinidad to Crest, he continued to be covered under the same savings and health plans. Mr. McHenry's titles with Crest were personnel manager and assistant to the vice president of operations. The remainder of Crest's management staff was assembled from either outside sources or the ranks of Apex Oil.
9. Crest began operations by purchasing two vessels, the "New York Getty" and the "Delaware Getty", from the Getty Oil Company. Said vessels were subsequently renamed the "Beaujolais" and "Pommard", respectively. Said vessels were purchased for Crest by an entity known as Apex Marine, Inc. Because of the sale of said vessels, the Getty Oil Company intended to lay off a number of licensed and unlicensed personnel aboard said vessels. Getty Oil Company furnished Crest with a list of employees that were going to be laid off and Crest then made inquiries among both licensed and unlicensed personnel to ascertain whether they desired employment with Crest. Crest actually manned said vessels *1273 almost entirely with unlicensed personnel laid off by Getty Oil Company. Said unlicensed employees of Getty Oil Company were represented by the Getty Tankermen's Association. In the fall of 1982, the Crest Tankermen's Association was formed among the unlicensed employees aboard the Beaujolais and Pommard and said Association demanded and received recognition by Crest as the bargaining representative of said employees. A collective bargaining agreement was executed on October 29, 1982, between the Crest Tankermen's Association and Crest.
10. On November 1, 1982, Crest began to operate with the two vessels it purchased from Getty Oil Company. A few days later Crest began to operate a third vessel which was purchased from a subsidiary of Gulf Oil Company. The vessel purchased from Gulf Oil Company, the "Gulf Crest", was renamed the "Montrachez". Although the unlicensed employees of Gulf Oil Company aboard the Gulf Crest were laid off as a result of the sale, Crest did not seek out said employees to man the Montrachez. The unlicensed employees aboard the Gulf Crest were represented by NMU. The Montrachez was purchased from Gulf Oil Company in the name of Apex Oil for Crest.
11. Clayton was formed in December of 1982. Clayton is a "paper" company. On January 26, 1983, Clayton agreed to purchase two vessels, the "Centimilion" and the "St. Emillion", from Grand Bassa Tankers, Inc., a subsidiary of Cities Service Oil Company. Said vessels were renamed the "Allegiance" and the "Banner", respectively. Said vessels were purchased with "working capital" obtained from Apex Holding. Prior to their purchase by Clayton, said vessels had been operated by Trinidad under a management contract with Grand Bassa Tankers, Inc. After their purchase by Clayton, said vessels were operated by Crest. Crest did not offer employment to any former Trinidad crew member aboard the Allegiance and Banner when Crest began operating said vessels.
12. In accordance with the right of first refusal under the management contract between Grand Bassa Tankers, Inc. and Trinidad, Grand Bassa Tankers, Inc. made several offers of sale to Trinidad. Upon the instructions of P.A. Novelly (hereinafter "Novelly"), Trinidad rejected said offers and the lowest offer was ultimately accepted by Clayton. However, prior to their purchase in January, 1983 by Clayton, both the Allegiance and the Banner were out of operation and were in "lay up". In addition, both vessels had been on the market for sometime prior to their lay up.
13. Subsequent to its purchase by Clayton, the Banner was sailed on one voyage and then sold for scrap. Thereafter, Clayton purchased the former "Gulf Oil" from Gulf Oil Company and renamed it the "Chablis".
14. On November 5, 1982, Shannon J. Wall, President of NMU, advised Novelly that NMU was aware of the fact that Apex Oil had purchased two vessels from the Getty Oil Company and one vessel from a subsidiary of Gulf Oil Corporation and that the NMU had not been asked to crew said vessels. Mr. Wall advised Novelly that the collective bargaining agreement between NMU and Trinidad applied to the purchase of said vessels and that in the event of Apex Oil's failure to apply said contract to said vessels, the NMU intended to file unfair labor practice charges with the National Labor Relations Board and to seek arbitration on the issue.
15. On March 31, 1983, NMU filed with the National Labor Relations Board charges of discrimination in employment against Clayton, alleging that Clayton had refused to hire the former NMU crews of the Allegiance and Banner because of their union affiliation. On April 15, 1983, NMU amended its charges to add a claim that Clayton had engaged in a refusal to bargain. On June 22, 1983, NMU, by its attorney, withdrew said charges against Clayton. On June 29, 1983, the Regional Director of Region 12 of the National Labor Relations Board in Tampa, Florida, approved NMU's withdrawal of said charges.
*1274 16. By letter dated April 19, 1983, NMU notified Trinidad, "Apex Tankers Co.", Crest, and Clayton, that Crest and Clayton were breaching Article I, Section 1 of the Collective Bargaining Agreement between NMU and Trinidad. NMU demanded arbitration.
17. On May 20, 1983, Jessie Simons Arbitration's, Inc. notified Trinidad, "Apex Tankers Co.", Crest, Clayton and NMU that it had scheduled the arbitration demanded by NMU for July 13 and 14, 1983, at the offices of the American Arbitration Association in New York City, New York.
18. Crest and Clayton filed this suit on June 21, 1983.
19. At the time of trial, none of the five (5) vessels which Trinidad had been operating on charter to Apex Oil in the summer of 1982, were operating. By the time of trial, three (3) of said vessels had been sold for scrap and two (2) had been laid up. However, at the time of trial, Crest was operating five (5) vessels under continuous voyage charters to Apex Oil. These vessels included the two owned by Crest, the Montrachez and the Beaujolais, the two owned by Clayton, the Allegiance and the Chablis, as well as a fifth vessel, the "Dina", owned by an unaffiliated company, the Los Angelas Steamship Company. By the time of trial, the Pommard and the Banner had been scrapped.
20. The Directors of Crest, Clayton, Trinidad, Apex Shipping, and Apex Holding are the same: Samuel R. Goldstein, P.A. Novelly, and Israel Treiman. Samuel R. Goldstein is Chairman of the Board of Trinidad, Crest, Clayton, Apex Shipping, and Apex Holding.
21. P.A. Novelly is President of Trinidad, Crest, Clayton, Apex Shipping, Apex Holding, and Apex Oil. As President of these companies, Novelly makes all major financial decisions for all of them. Novelly also hires and directs the designated chief operating officers of Trinidad and Crest. Novelly determines when a vessel owned by Trinidad, Crest or Clayton is to be scrapped. Novelly made the decision that Clayton, rather than Trinidad, should buy the Allegiance and the Banner from Grand Bassa Tankers, Inc.
22. A. Bryant Foster is an Executive Vice President of Trinidad, Crest, Clayton, Apex Shipping and Apex Holding.
23. Robert W. Ziha is Secretary of Crest, Clayton and Apex Holding, and an Assistant Secretary of Trinidad and Apex Shipping.
24. Thomas Cornwall is the Executive Vice President of Crest and Clayton. He is also Apex Oil's chartered ship broker. In this latter capacity, his subordinates issue sailing orders to the vessels under Apex Oil charter, instructing them where to pick up and discharge cargo. The only U.S. flag tankers which have been under charter to Apex Oil while Cornwall has been its chartered ship broker have been those operated by Trinidad and Crest.
25. Apex Oil has, on occasion, initially designated a Crest vessel to take cargo and then substituted a Trinidad vessel to take said cargo, and vice versa. Apex Oil, as a chartering party, has the prerogative to designate which vessel carries which cargo.
26. The day-to-day operations of Crest and Trinidad are not interrelated. Crest and Trinidad do not perform any work for each other. There is little or no routine or other official contact between the day-to-day management and staff of Crest and Trinidad. Crest and Trinidad operate out of separate ports: Crest operates out of St. Louis, Missouri, and Trinidad operated out of Philadelphia, Pennsylvania, and Long Beach, California. Trinidad now maintains its headquarters in St. Louis County, Missouri, but its offices are at a different location than Crest's. Moreover, Trinidad maintains its operation staff in Philadelphia to manage the Military Sealift Command vessels and its Long Beach officers as home port for commercial vessels on the west coast. Crest maintains no staff outside of St. Louis County, Missouri. The vessels operated by Crest maintain their own registration, safety certificates, classification documentation and other necessary certification on board ship with copies in St. *1275 Louis. Trinidad vessels are registered in Wilmington, Delaware. Crest and Trinidad maintain separate books and records, separate bank accounts and separate lines of credit. Crest and Trinidad each constitute a separate profit center and each is responsible for reporting its operating results to its parent. Crest and Trinidad have separate operating personnel. There is no interchange of operations management, or supervisory or operations personnel between Crest and Trinidad. Crest and Trinidad's unlicensed employees are represented by separate unions functioning under separate union contracts. Crest reimburses Apex Oil for salaries paid by Apex, office space used by Crest, and other related office expenses. Trinidad also pays its own rent, office expenses, and its own management salaries from its own payroll. Crest and Trinidad are separately responsible for decisions regarding repairs to vessels, dry docking, and machinery overhaul. Crest and Trinidad separately provide logistical support necessary for the operation of their vessels. Each company separately arranges for its own agents at port, port financing, as well as port safety and liaison with the charterer. Crest and Trinidad each has its own purchasing department.
27. The scope of operations performed by Crest and Trinidad are not identical. All of the vessels operated by Crest have been and are under charter to Apex Oil. Trinidad's operations, on the other hand, have been and are more extensive. Prior to Crest's creation, Trinidad operated several ships under charter to Apex Oil. In addition, Trinidad operated several vessels for the Military Sealift Command, operated under consecutive voyage charters to Apex Oil subsidiaries, and operated vessels under consecutive voyage charters to Standard Oil Company and Atlantic Richfield under a joint venture agreement with Sun Oil Company. At the present time, Trinidad is not operating any vessels under charter to Apex Oil, but its other operations are extant. Crest does not solicit any business for itself, because its vessels are under charter to Apex Oil. Trinidad may secure business by Apex Oil charter, Government contract, or by management contract to other oil companies. Crest vessels generally ply a trade route consisting of the U.S. Gulf and Florida to northeast trade ports and occasionally, Caribbean ports. Trinidad operates on both the east and west coasts of the United States and plies trade routes in Europe and the Far East. There is a significant difference in the size of the ships operated by Trinidad and those operated by Crest. Trinidad's ships that were chartered by Apex Oil were "T-2's", which have a capacity of 26,000 long tons. Crest's fleet, on the other hand, consists of one "T-2" and four "jumboized T-2's", which have a capacity of 30,000 long tons.
28. The labor relations operations of Crest and Trinidad are separate. Crest and Trinidad hire their own seagoing personnel. The first contract between Crest and the Crest Tankerman's Association was drafted initially by a Crest executive and then negotiated by an attorney on the staff of Apex Oil. Trinidad's most recent contract with NMU was negotiated on behalf of Trinidad by the Tanker Services Committee, a multiemployer association of which Trinidad is a member and as such paid $80,000.00 in annual dues. The Tanker Services Committee is an association of independently owned corporations who join together for the purpose of collective bargaining with NMU. The wage reopener contained in the contract between Crest and the Crest Tankermen's Association was negotiated in 1983 on behalf of Crest by the Crest Vice President of Operations and Fleet Manager. Grievances and labor disputes are handled separately by Crest and Trinidad. Grievances and disputes are handled with the Crest Tankermen's Association on behalf of Crest by either the Fleet Manager or the Vice President of Operations. All disputes under the Crest Tankermen's contract are subject to resolution pursuant to the terms of the grievance machinery contained therein. Trinidad has its own separate grievance machinery including the use of an arbitrator mutually selected by the Tanker Services Committee and NMU. There is no substantial continuity or overlap *1276 between the employees of Trinidad and the employees of Crest.
29. Apex Holding files a consolidated tax return covering all of its subsidiaries, including Crest, Clayton, and Trinidad.
30. Apex Holding has a legitimate purpose for placing the ownership of vessels under charter to Apex Oil in separate corporate entities, namely to reduce exposure to risk and limit liability for accidents, etc.
31. Business conditions in the shipping industry are depressed.
32. There was evidence presented at trial which suggested that Crest officials and supervisors were opposed to hiring NMU sympathizers. There was also evidence that Novelly is less than friendly towards NMU. Novelly does not respond to letters from NMU President Shannon Wall. Mr. McHenry has stated that Crest did not hire employees from the traditional maritime union halls because it has a "different philosophy".

CONCLUSIONS OF LAW
This is an action by Crest and Clayton to obtain a judgment declaring that they are not parties to, nor bound by, the collective bargaining agreement between NMU and Trinidad, as well as injunctive relief against NMU's efforts to compel Crest and Clayton to arbitrate. On April 19, 1983, NMU, relying on the accretion clause in its contract with Trinidad, demanded that Crest and Clayton arbitrate NMU's claim that Crest's unlicensed seagoing personnel were covered by the NMU/Trinidad contract on the theory that Crest and Clayton were "affiliates" of Trinidad within the meaning of said contract. See Findings of Fact No. 16. For the reasons stated in this Court's Order and Memorandum of August 23, 1983, this Court has jurisdiction over plaintiffs' claim under § 301(a) of the Labor Management Relations Act, as amended, 29 U.S.C. § 185(a). Crest Tankers, Inc. v. National Maritime Union of America, No. 83-1481C(1) (E.D.Mo., August 23, 1983).
An employer is not under an obligation to arbitrate a labor dispute unless it is bound by an agreement to arbitrate said dispute in a collective bargaining agreement. Maas v. Dubuque Packing Company, No. 84-1388, slip op. at 8 (8th Cir., February 8, 1985) (Gibson, J., concurring in part and dissenting in part); Morello v. Federal Barge Lines, Inc., 746 F.2d 1347, 1350 (8th Cir.1984). As this Court explained in the prior Order and Memorandum, a non-signatory employer may be bound by a collective bargaining agreement signed by another employer, and thus bound by any agreement to arbitrate found therein, if two independent findings are made: first, that the nonsignatory employer and the signatory employer constitute a "single employer"; and second, that the employees of both employers constitute a single appropriate bargaining unit. Service, Hospital, Nursing Home and Public Employees Union, Local No. 47 v. Commercial Property Services, Inc., 755 F.2d 499, 501 (6th Cir.1985); Iowa Express Distribution, Inc. v. National Labor Relations Board, 739 F.2d 1305, 1310 (8th Cir. 1984); Carpenters Local Union No. 1846 v. Pratt-Farnsworth, 690 F.2d 489, 505 (5th Cir.1983). Pursuant to this Court's prior Order and Memorandum, the trial in this action focused solely on the single employer issue. Accordingly, this Court does not express an opinion on whether this Court has subject matter jurisdiction to consider the bargaining unit issue nor does this Court express an opinion on the merits of said issue. See Brotherhood of Teamsters Local No. 70 v. California Consolidators, Inc., 693 F.2d 81 (9th Cir.1982), cert. denied, ___ U.S. ___, 105 S.Ct. 263, 83 L.Ed.2d 199 (1984) (White, J., dissenting).
In its brief, NMU argues that the alter ego doctrine, in addition to the single employer doctrine, is applicable to this case. However, the reported decisions make it clear that the two doctrines are distinct and that the alter ego doctrine does not apply in the case at bar. The single employer doctrine was created by the National Labor Relations Board to allow the *1277 Board or a court to treat "two or more related enterprises as a single employer for purposes of holding the enterprises jointly to a single bargaining obligation or for the purpose of considering liability for any unfair labor practices." Iowa Express Distribution, Inc., at 1310 (citation omitted). The alter ego doctrine, on the other hand, "focuses on whether one business entity should be held to the labor obligations of another business entity that has discontinued operations." Id. (citation omitted) (emphasis added). Although similar factors are considered in applying both doctrines, "[t]he essential inquiry under the alter ego analysis is `[w]hether there was a bona fide discontinuance and a true change of ownership ... or merely a disguised continuance of the old employer.'" Id. (citation omitted). See also Pratt-Farnsworth, 690 F.2d at 504-09. The alter ego doctrine has no applicability to the case at bar, because Trinidad is not a discontinued employer. See Findings of Fact Nos. 2, 27. Thus, the appropriate analytical framework is the single employer doctrine.
Four factors must be considered to determine whether two distinct business entities constitute a single employer. These factors are: 1) interrelation of operation; 2) common management; 3) centralized control of labor relations; and 4) common ownership or financial control. Iowa Express Distribution, Inc., at 1310; Pratt-Farnsworth, 690 F.2d at 504-05. No one of these factors is controlling. Id. "Single employer status ultimately depends on `all the circumstances of the case' and is characterized as an absence of an `arm's length relationship found among unintegrated companies'." Pratt-Farnsworth, 690 F.2d at 505 (citations omitted). Application of these factors to the facts of this case presents a close question. There is evidence which supports both parties with respect to almost every factor.
The first factor that must be considered is the degree of interrelation between the operations of Crest and Trinidad. In the opinion of this Court, the degree of interrelation between Crest and Trinidad is not great. Although the work being done now by Crest under charter to Apex is similar to the work that was done by Trinidad under charter to Apex, prior to the scrapping and laying up of several of Trinidad's vessels, the scope of Trinidad's operations is greater than Crest's. See Findings of Fact No. 27. Trinidad's trade route coverage is also much greater than that of Crest. Id. The size of the ships operated by the two companies is also significantly different. Id. There is no intermingling of the employees of Crest and Trinidad. This Court does not deem it significant that, during the period when there was enough business to keep both Crest's and Trinidad's vessels working for Apex Oil, a Crest vessel was occasionally substituted for a Trinidad vessel to take cargo, and vice versa. See Findings of Fact No. 25. More importantly, almost every aspect of the day-to-day management and operations of Crest and Trinidad are entirely separate. See Findings of Fact No. 26. This Court's conclusion that there is no significant degree of interrelation of operations between Crest and Trinidad, is not defeated by the fact that Thomas Cornwall is the common source for allocation of cargos and routes to vessels under Apex charter. Crest and Trinidad are nevertheless kept at an arm's length from each other.
The second factor that must be considered is the extent to which the management of Crest and Trinidad is common. It is true that the directors and several of the officers of Crest, Clayton and Trinidad are shared. See Findings of Fact Nos. 20, 21, 22, 23, and 24. However, the control of operations and the supervisors of day-to-day operations and management are entirely separate. See Findings of Fact No. 26.
The third factor, labor relations, is concerned with the extent to which the labor relations operations of the two firms are integrated. In the case at bar, the labor relations operations of Crest and Trinidad are separate. See Findings of Fact No. 28. There is no continuity between the employees of Trinidad and those of Crest. The unlicensed seagoing personnel of both *1278 companies operate under separate collective bargaining agreements with separate unions. Moreover, the day-to-day hiring, firing, and handling of grievances and labor disputes are separate. Id. Although Novelly and other common directors and officers of Crest and Trinidad have the authority to dictate labor relations policies, there was insufficient evidence that such authority had, in fact, been exercised.
The final factor is whether or not there is common ownership. In this case plaintiffs admit that Crest, Clayton and Trinidad are commonly owned by Apex Holding. See Findings of Fact Nos. 1, 2, 3, and 4. One distinction, of course, is that Trinidad is held by Apex Shipping for Apex Holding, whereas Crest and Clayton are held directly by Apex Holding. See Findings of Fact No. 4.
It is clear that there is sufficient evidence to support both a finding that Crest and Trinidad constitute a single employer and a contrary finding. On balance, this Court concludes that Crest and Trinidad do not constitute a single employer for purposes of holding Crest and Clayton to the obligations of Trinidad's collective bargaining agreement with NMU. In terms of both form and function, Crest and Clayton are operated as entities which are separate and distinct from Trinidad. This Court is not convinced that Crest and Clayton were created for improper purposes. See Findings of Fact No. 30. Moreover, it is not surprising that Crest's vessels are operating and Trinidad's vessels are not, because Crest's vessels are able to carry greater loads. See Findings of Fact No. 27. It is not fatal to plaintiff's case that persons at the top of the "pyramid" have the power to affect Trinidad and Crest as they see fit. This is true of almost every integrated business where there is a parent with several subsidiaries. Ultimate control at the very top, standing alone, should not and does not result in two subsidiaries being treated as a single employer. Here, those at the top keep Trinidad and Crest at "arm's length" apart. Thus, this Court holds that Crest, Clayton and Trinidad do not constitute a single employer and plaintiffs are entitled to a judgment declaring that they are not bound by Trinidad's collective bargaining agreement with NMU or Trinidad's agreement to arbitrate with NMU.
NMU urges this Court to follow the recent decision by Justice Maresca of the Supreme Court of New York, County of New York, in District No. 1-Pacific Coast District, Marine Engineers' Beneficial Association, AFL-CIO v. Trinidad Corporation, No. 92884-83 (November 14, 1984). In that case, to which Crest and Clayton were not parties, Justice Maresca confirmed an arbitration award in favor of "MEBA", the union representing Trinidad's officers and engineers. The arbitrator ruled that Crest, Clayton and Trinidad are alter egos and constitute a single employer. In addition, the arbitrator ruled that Crest and Clayton are subsidiaries or affiliates within the meaning of Trinidad's contract with MEBA. This Court declines to follow Justice Maresca's decision, because it does not provide any meaningful discussion of why Clayton and Crest are the alter egoes of Trinidad and together constitute a single employer.
This Court notes that plaintiffs seek injunctive relief that will extend to Trinidad and the entire Apex chain of ownership, as well as Crest and Clayton. This Court declines to go that far. The sole issue presented to and decided by this Court is whether, by virtue of the single employer doctrine, Crest and Clayton are bound by the Trinidad/NMU agreement to arbitrate. Having answered this issue in the negative, it does not follow that Trinidad, or any of its parent corporations, are not bound to arbitrate or otherwise negotiate with NMU with respect to the operations of Clayton and Crest. See Commercial Property Services, Inc., at 501. Accordingly, this Court's permanent injunction is directed only to NMU's efforts to compel Crest and Clayton to arbitrate.