**CREST TANKERS, INC., and Clayton Tankers, Inc., Appellees,**

v.

**NATIONAL MARITIME UNION OF AMERICA, Appellant.**

**No. 85–1575.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 15, 1986.

Decided July 15, 1986.

Rehearing and Rehearing En Banc Denied Aug. 13, 1986.

Sidney H. Kalban, New York City, for appellant.

Thomas M. Hanna, St. Louis, Mo., for appellees.

Before HEANEY, ARNOLD and WOLL-MAN, Circuit Judges.

ARNOLD, Circuit Judge.

Crest Tankers, Inc., and Clayton Tankers, Inc., filed this suit for injunctive and declaratory relief on June 21, 1983, against the National Maritime Union of America (NMU). The action came in response to the union's attempt to compel these employers to arbitrate under a labor contract between the NMU and Trinidad Corporation, which has the same ultimate ownership as plaintiffs. The District Court found that Crest and Clayton, with Trinidad, should not be treated as one under the single-employer doctrine, and enjoined NMU's arbitration efforts on the ground that plaintiffs were not parties to the labor agreement. *Crest Tankers, Inc. v. NMU*, 605 F.Supp. 1270 (E.D.Mo.1985). While the union does not appeal the single-employer ruling, NMU does challenge the District Court's determination that a second labor-law doctrine, that of alter ego employers, was inapplicable in this situation as a matter of law. NMU also argues that the District Court erroneously refused to apply the doctrine of collateral estoppel to a New York trial court decision finding Trinidad and the

plaintiffs to be alter egos and a single employer. Although we decline to apply collateral estoppel in these circumstances, we reverse on the ground that the District Court misconstrued the principle of alter ego employers and remand for factual consideration of this case under that doctrine.

## I.

Details of the relationships among Crest, Clayton, Trinidad, and their parent companies are set out in depth in the District Court's well-written opinion. 605 F.Supp. at 1271–1276. Trinidad is a wholly-owned subsidiary of Apex Shipping, which in turn is a wholly-owned subsidiary of Apex Holding, itself a wholly-owned subsidiary of Apex Oil Co. Both Crest and Clayton are also wholly-owned subsidiaries of Apex Holding. All the companies have essentially the same corporate management. Apex Shipping purchased Trinidad in 1981; Crest and Clayton were organized in 1982. Trinidad and Crest both own and operate United States flag vessels, although Trinidad also operates vessels of the Military Sealift Command of the United States Navy; Clayton is a paper corporation which owns U.S. flag vessels operated by Crest.

■ Trinidad and NMU had a collective-bargaining agreement effective from 1981 through June 1984, which provided that the company:

recognizes the Union as the sole collective bargaining agent for the Unlicensed Personnel employed by the Company on board all U.S. Flag oceangoing vessels ... which are owned or operated ... by the Company or any of its subsidiaries or affiliates (whether so at present or at any time during the life of this Agreement)....[1]

When Crest began its operations, it purchased two vessels from Getty Oil Co.; the ships were operated almost entirely by unlicensed personnel laid off by Getty who had been represented by the Getty Tankermen's Association. The new Crest employees then formed the Crest Tankerman's Association (CTA), which the company recognized as bargaining representative. Shortly thereafter, when Crest purchased two vessels from Gulf Oil Co., it did not hire the former Gulf employees, who were represented by the NMU. Crest also purchased from Grand Bassa Tankers, Inc., two vessels which had been operated under contract by Trinidad. Trinidad had the right of first refusal on the vessels, but was told not to buy them by the same Apex official who directed their purchase by Crest. Former Trinidad crew members were not offered work by Crest. By the time of trial in November 1983, most if not all of the charter shipping once done for Apex by Trinidad was being done by Crest. Just prior to the formations of Crest and Clayton, Trinidad operated five vessels on charter to Apex Oil; as of the trial, none of those was operating, while Crest was operating five such vessels for Apex, including one of the Grand Bassa tankers formerly operated by Trinidad.

NMU notified Apex officials in November 1982 of its position that the vessels obtained for Crest fell under the NMU–Trinidad agreement. In March 1983, the union filed with the NLRB and later withdrew discrimination charges against Clay-

---

**1.** It seems clear that Crest and Clayton are "affiliates" of Trinidad, but the NMU does not claim that this clause in the contract of its own force subjects Crest and Clayton to any obligation to bargain. Such "accretion" clauses are, in general, enforceable only if the affiliates or subsidiaries in question are so closely related to the company named in the contract as either to fit within the single-employer doctrine, or to be its alter ego. Otherwise, employees of the affiliates or subsidiaries might lose the right to choose their own bargaining representative.

We discuss "single employer" and "alter ego" in this opinion as though they were two separate ideas. In doing so, we adopt the approach of text-writers and digesters, to whose hearts such neat categories are dear. In fact, what is really happening, it seems to us, is that a number of factors, including anti-union motivation, are being treated as relevant to the question whether one employer, formally separate, should be viewed as legally the same as another. When the requisite degree of anti-union motivation is present, this question is answered "yes," even though the other factors considered might not suffice to produce this result.

ton. NMU then demanded arbitration under the contract; the arbitration was scheduled, and Crest and Clayton filed this suit, alleging that as non-signatories of the contract, they were not bound by it. The union moved to dismiss the action, on the ground that issues of representation and appropriate bargaining unit are within the jurisdiction of the NLRB. The District Court denied the motion, held that it had jurisdiction under § 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a), and stated that the only issue at trial would be whether the three Apex subsidiaries constituted a single employer. The District Court ruled in plaintiffs' favor and this appeal followed.

## II.

◼ In general, only a party to a collective bargaining agreement is bound by its terms; however, in some instances, an employer which has not signed a labor contract may be so closely tied to a signatory employer as to bind them both to the agreement. Two theories for demonstrating this "high degree of consanguinity," *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 511 (5th Cir. 1982), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983), are relevant here. The first is the single-employer doctrine, discussed by the District Court, in which the basic inquiry is whether the commonality of the employers' operations, management, labor relations, and ownership or financial control, *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965), is sufficient to indicate that they should be treated as one whole. In this case, although the District Court twice said evidence would support either holding, 605 F.Supp. at 1277, 1278, it found that the companies were not a single employer, despite their common ownership, because the interrelation among their operations was not great; the daily managements were unconnected even though the corporate management was identical; and labor relations were conducted separately,

although the same Apex official had the authority to deal with labor at both.

◼ The second theory of employer consanguinity relevant here is the alter ego doctrine. The union does not challenge the court's decision on the single-employer issue, but it does argue that the District Court erred in refusing also to consider the circumstances of this dispute against the standards of the alter ego doctrine. The District Court cited in particular our decision in *Iowa Express Distribution, Inc. v. NLRB*, 739 F.2d 1305 (8th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984), for the proposition that the alter ego doctrine deals only with whether one employer has succeeded to the labor obligations of another now-defunct employer. "The alter ego doctrine has no applicability to the case at bar, because Trinidad is not a discontinued employer." 605 F.Supp. at 1277. However, an examination of the doctrine shows, as NMU contends, that this labor-law principle is not so restrictive.

◼ As this Court said in *Iowa Express*, 739 F.2d at 1310, the factors used to decide whether one employer is another's alter ego—ownership, management, business purpose, operations, customers and equipment—are similar to those used in single-employer analysis. But "the Board's decisions have made it clear that the doctrines are conceptually distinct," *Pratt-Farnsworth*, 690 F.2d at 508 n. 7. The first distinction is related to the proposition that the District Court found dispositive: While affirmative findings on either theory produce the same result—that for labor-law purposes, only one employer exists—the alter ego doctrine generally applies to situations where one employer has in some way succeeded another, often through a change in corporate structure. The second distinction is motivational: A critical part of the inquiry into alter ego status, absent in single-employer analysis, is whether the employers acted out of anti-union sentiment or to avoid a labor contract. *Iowa Express*, 739 F.2d at 1311. " '[T]he focus

of the alter ego doctrine, unlike that of the single employer doctrine, is on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets,'" *Iowa Express*, 739 F.2d at 1310, *quoting Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 24 (1st Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). See also Note, *Bargaining Obligations After Corporate Transformations*, 54 NYU L.Rev. 624, 638–39 (1979).[2]

Critical to the District Court's refusal to apply the alter ego doctrine was this Court's description of that issue in *Iowa Express* as "'whether one business entity should be held to the labor obligations of another business entity that *has discontinued operations.*'" 605 F.Supp. at 1277 (emphasis added), quoting *Iowa Express*, 739 F.2d at 1310. *Iowa Express* did deal with a discontinued business and the successor company alleged to be its alter ego, and many other alter ego cases also involve such situations. But its description of the doctrine was not a comprehensive or exhaustive statement of all the circumstances in which it could be appropriately applied. Neither the courts nor the National Labor Relations Board have limited the alter ego analysis to those fact patterns where the original employer has disappeared entirely. *NLRB v. Borg Warner Corp.*, 663 F.2d 666 (6th Cir.1981) (per curiam), *cert. denied*, 457 U.S. 1105, 102 S.Ct. 2903, 73 L.Ed.2d 1313 (1982), involved two Borg Warner subsidiaries. The parent company created Wells Fargo, which was not unionized, by siphoning off the courier-service operation from unionized Pony Express, which remained in operation as an armored-car service. The Sixth Circuit approved the Board's finding that Wells Fargo was the alter ego of Pony Express, even though the latter was not discontinued. See also *NLRB v. Allcoast Transfer Inc.*, 780 F.2d 576 (6th Cir.1986). The NLRB also has applied the alter ego doctrine when only part of the original employer's business has been diverted to a new entity, see *All Kind Quilting*, 266 NLRB 1186 (1983); *McDonald's Ready-Mix Concrete*, 246 NLRB 152 (1979). Nor have findings of alter ego status been limited to situations where all of one part of a company's business has been diverted to a second entity. See *Auto Processing Co. and Auto Warehousing Co.*, 258 NLRB 854 (1981).

■ We believe this approach is correct, particularly in light of the critical motivational aspect of our alter ego analysis. To limit the doctrine's applicability to companies which have shut down entirely would allow anti-union employers a complete escape from alter ego liability, simply by keeping a small aspect of the predecessor operation alive. Therefore, this case will be remanded so the District Court can evaluate NMU's allegation that Crest and Clayton are the alter ego of that portion of Trinidad's tanker operations which existed prior to the creation of the new subsidiaries.

### III.

The union's second ground for reversal on appeal is that the question of the relationship among Crest, Clayton, and Trinidad is foreclosed by collateral estoppel.

**2.** The Sixth Circuit has recently accepted an argument that a finding of anti-union animus or "employer intent [to evade obligations under the NLRA] is not essential or prerequisite to imposition of alter ego status." *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 581 (6th Cir.1986), noting that we made no mention of such a requirement in *NLRB v. Campbell-Harris Elec., Inc.*, 719 F.2d 292 (8th Cir.1983). A requirement that employer intent be demonstrated could hinder the goals of the doctrine, the *Allcoast* Court said: "[A]n employer who desired to avoid union obligations might be tempted to circumvent the doctrine by altering the corporation's structure based on some legitimate business reason, retaining essentially the same business and utilizing the change to escape the unwanted obligations." 780 F.2d at 582. We consider the difference between this statement and our position in *Iowa Express Distrib. Inc. v. NLRB*, 739 F.2d 1305 (8th Cir.) *cert. denied*, —— U.S. ——, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984), to be largely one of degree, and note that the mere existence of "some legitimate business reason" for a change in corporate organization should not alone prevent a finding of alter ego status.

This argument is based on the affirmance by a New York court, in a dispute almost identical to this one involving another maritime union, of an arbitrator's decision that the three Apex subsidiaries are a single employer, alter egos, and all bound under the "subsidiary or affiliate" clause of the NMU contract. *District No. 1—Pacific Coast District, Marine Engineers' Beneficial Ass'n, AFL-CIO v. Trinidad Corp.,* No. 92884–83 (N.Y.Sup.Ct. Nov. 14, 1984). In so ruling, the state court said that "unless Trinidad convincingly demonstrates that the arbitration decision does not 'draw its essence' from the Trinidad-MEBA collective bargaining agreement, [this] court 'is bound to enforce the award and is not entitled to review the merits of the contract dispute'. *W.R. Grace and Co. v. Local Union 759,* 461 U.S. 757, 103 S.Ct. 2177, [76 L.Ed.2d 298] (1983)." *Id.* at 3.

The District Court declined to follow the New York decision "because it does not provide any meaningful discussion of why Clayton and Crest are the alter egoes of Trinidad and together constitute a single employer." 605 F.Supp. at 1278. The defendant argues that it was error for the District Court to consider the quality of the reasoning of the state trial court in deciding whether collateral estoppel applies. See *University of Illinois Foundation v. Blonder-Tongue Laboratories, Inc.,* 465 F.2d 380 (7th Cir.), *cert. denied,* 409 U.S. 1061, 93 S.Ct. 559, 34 L.Ed.2d 513 (1972). NMU further states that although Crest and Clayton were not parties in the New York case, collateral estoppel is warranted here because "Trinidad clearly represented the interest of the Apex Oil family companies." Appellant's Brief at 26.

■ We agree with the District Court that collateral estoppel is unavailable under these circumstances, for two reasons. First is the question of identity of parties. NMU cites a number of cases for the proposition that subsidiaries of a parent corporation—like chaplains in a federal prison

system, *Church of New Song v. Establishment of Religion,* 620 F.2d 648 (7th Cir. 1980), *cert. denied,* 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981), or employees of the same state sued on the same question, *Micklus v. Greer,* 705 F.2d 314 (8th Cir.1983)—are privies. There are no doubt instances where that is so. Here, however, the procedural issue of privity is, in essence, also the substantive issue to which NMU would apply collateral estoppel: Are these entities so closely allied as to be considered the same? The circularity involved in answering this question makes collateral estoppel inappropriate here.

■ Moreover, the New York trial court did not directly hold, on de novo consideration, that Crest and Clayton were alter egos of Trinidad. It held only that no good reason not to defer to the arbitrator's award had been shown. Such an oblique disposition of an issue is not sufficient to preclude later litigation.[3]

The judgment of the District Court is reversed, and the cause remanded for further proceedings on the question of alter ego, in accordance with this opinion.

It is so ordered.

---

3. The arbitration reviewed by the New York court took place after an injunction obtained by these plaintiffs was vacated, *In re District No. 1—Pacific Coast District, Marine Engineers' Beneficial Ass'n,* 723 F.2d 70 (D.C.Cir.1983). Counsel for plaintiffs has informed us that the NLRB has issued a complaint against the MEBA in the New York case, alleging the union committed an unfair labor practice in attempting to enforce the arbitrator's award.