**CREST TANKERS, INC., Clayton Tankers, Inc., Plaintiffs,**

v.

**NATIONAL MARITIME UNION OF AMERICA, Defendant.**

No. 83–1481C(1).

United States District Court,
E.D. Missouri.

Aug. 4, 1987.

Thomas M. Hanna, St. Louis, Mo., for plaintiffs.

Robert Bogard, St. Louis, Mo., Ned R. Phillips, Sidney H. Kalban, New York City, for defendant.

## MEMORANDUM

NANGLE, Chief Judge.

This case is now before the Court on remand from the United States Court of Appeals for the Eighth Circuit for further proceedings on the alter ego question. *Crest Tankers, Inc. v. National Maritime Union of America*, 796 F.2d 234 (8th Cir. 1986). Pursuant to the judgment entered by the Eighth Circuit, this Court held additional hearings on the alter ego question sitting without a jury.

This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as

required by Rule 52 of the Federal Rules of Civil Procedure. *Fed.R.Civ.P.* 52.

## I. FINDINGS OF FACT

A. The business operations of Trinidad have declined since its purchase by Apex Shipping.[1] Trinidad no longer manages the 125,000–ton tanker for Alaska Bulk Carriers, a company in which Trinidad owned a 19% interest and in which a Sun Oil affiliate owned the remaining interest. In August, 1983, over the objection of Trinidad's director, the Board of Directors of Alaska Bulk Carriers switched management of the vessel from Trinidad to a Sun Oil affiliate. In June, 1984, Trinidad's Military Sealift Command contracts expired. When the contracts were again put up for bid, Trinidad did not bid on them. In addition, City Services terminated its management contracts with Trinidad due to a decreased demand for tanker shipping. The five T–2 vessels owned by Trinidad were scrapped between July, 1982, and April, 1984.

B. The T–2 tanker class was built during World War II. Originally, these vessels had a capacity of 16,000 tons. Since these vessels have been purchased by private business, many have been "jumboized" to increase their cargo capacity to between 20,000 and 31,000 tons.

Trinidad owned five T–2 vessels: the Bordeaux (previously San Antonio), Houston, Meursault (previously Ft. Worth), Pasadena, and Vouvray (previously Austin). These boats had been "jumboized", increasing their capacity to between 26,900 tons and 27,600 tons.

At the time Apex purchased Trinidad, four of these T–2's were under long-term charter to Shell Oil Corporation. At the time of their charter by Shell, these T–2's had been fitted to carry 11 distinct types of cargo. These T–2's plied the "drugstore trade", carrying multi-grade cargoes up and down the east and west coasts of the United States. To carry these distinct cargoes, these T–2's required separate piping

---

1. The findings of fact made by this Court in this case and reported in *Crest Tankers, Inc. v. National Maritime Union of America*, 605 F.Supp. 1270 (E.D.Mo.1985), are incorporated herein.

The findings of this earlier opinion are referred to by the number assigned in that opinion. To avoid confusion, the findings of the instant opinion are identified by letters.

and pumping for each oil grade. These modifications required greater maintenance and slowed loading and unloading of cargo.

The fifth T–2 owned by Trinidad was chartered to the Military Sealift Command until April, 1981.

C. As the T–2's were released from charter by Shell Oil, they were placed under charter to Apex Oil, Trinidad's parent corporation. The Pasadena charter to Shell expired on September 15, 1982, but in February of that year Shell Oil notified Trinidad that it would not renew the contract. The Meursault charter ended when Shell Oil exercised its right to terminate the contract due to the failure of the cargo tank coatings. The Houston and Vouvray charters lapsed in January, 1982.

D. After the T–2 tankers entered service for Apex Oil, they performed little work for the corporation. At the time Crest began operations in November, 1982, the Meursault and Vouvray were not carrying cargo for Apex and had been scrapped. After leaving Shell Oil but before the beginning of Crest's operation, the Pasadena made three voyages for Apex Oil, totaling 41 days of service. Prior to its final voyage and scrapping in August, 1983, the Pasadena spent 202 days in lay-up. At the time Crest was formed, the Houston had been laid up for 74 days. Subsequently, the Houston spent 298 days in lay-up, performed three voyages for the Military Sealift Command, totaling 104 days, and performed four voyages for Apex Oil, totaling 99 days. Thereafter, the Houston was sold for scrap in February, 1984. After leaving the Military Sealift Command and before Crest began operations, the Bordeaux performed 23 voyages totaling 391 days and was in lay-up 383 days. During this period, the Bordeaux performed 13 voyages for Apex Oil, totaling 258 days. After the formation of Crest, the Bordeaux made three grain voyages, totaling 126 days, before it was sold as scrap in April, 1984.

From the time of Trinidad's purchase by Apex until the T–2's were each scrapped, the five T–2's had a potential for 4,401 days of service. The vessels spent 940 days, or 21% of their available time, under charter to Apex Oil. During this period, these vessels spent 2,406 days, or 55% of their available time, under charter to other carriers. The remaining time was spent in lay-up for repairs or due to lack of employment. Only the Bordeaux spent more time working for Apex than for other customers.

E. The scrapping of the T–2's was motivated by economic considerations independent of the NMU Collective Bargaining Agreements. During the 1980's, the drugstore trade for which four of the T–2's were equipped was in decline. The trade shifted to vessels carrying one or two, rather than 11, grades of oil. The greater maintenance and slower loading resulting from the ships' modifications for the drugstore trade placed these ships at an economic disadvantage.

Federal regulation also increased the cost of operating these vessels. Under 46 U.S.C. § 3705, all vessels over 20,000 tons must have segregated ballast systems. For the T–2's to meet this requirement, a dedicated ballast system would have been installed. This system could only carry ballast water, not cargo, and therefore would have reduced the cargo capacity of these vessels by 6,000 to 7,000 tons. Alternatively, the T–2's could have been "remeasured", a procedure which limits the cargo to less than the 20,000–ton minimum above which the Act applies.

F. Trinidad's scrapping of the T–2's is consistent with the worldwide decline in small tankers. From June 30, 1982, to July 1, 1985, the number of T–2 tankers decreased from 79 to 30. Worldwide, vessels under 30,000 tons decreased from 553 to 508 from January 1, 1981, to January 1, 1986. During 1981 to 1985, 50 vessels of less than 27,000 tons under the United States flag were scrapped.

G. P.A. Novelly is the President of Trinidad Corporation, Crest Tankers, Inc., Clayton Tankers, Inc., Apex Shipping, Inc., Apex Holding Company, and Apex Oil Company. As the Chief Executive Officer of Crest, Clayton, and Trinidad, Novelly has the ultimate authority to negotiate the Collective Bargaining Agreements of these companies. During the 1986 negotiations

between the National Maritime Union of America (NMU) and Trinidad, Novelly made suggestions and recommendations concerning Trinidad's proposals and positions.

Novelly dislikes unions and would prefer no unionized employees. In particular, Novelly told his subordinates at Crest that he preferred it to be a non-union company.

H. Apex Oil chose to have Crest operate the vessels purchased from Gulf Oil and Getty Oil, in part, to take advantage of the lower labor costs associated with non-union contracts.

I. Trinidad did not exercise its right of first refusal to purchase vessels operated under a management contract with Grand Bassa Tankers, Inc. Clayton purchased these vessels, and Crest operated these vessels because the latter could operate these vessels more cheaply.

## II. CONCLUSIONS OF LAW

By this action, Crest and Clayton seek a declaration that they are neither parties to, nor bound by, the Collective Bargaining Agreement between NMU and Trinidad. Crest and Clayton seek also to enjoin NMU's efforts to compel them to arbitrate. Relying upon the accretion clause in the Trinidad contract, NMU demands that Crest and Clayton arbitrate NMU's claim that the unlicensed seagoing personnel of Crest are covered by the NMU/Trinidad contract.

Generally, an employer is not obliged to arbitrate a labor dispute unless bound by a Collective Bargaining Agreement to arbitrate said dispute. However, a non-signatory employer may be bound by a Collective Bargaining Agreement signed by another employer under the single employer or alter ego doctrines. As this Court concluded in its earlier opinion, Trinidad, Crest, and Clayton should not be treated as one under the single employer doctrine. This Court also concluded as a matter of law that the alter ego doctrine did not

apply. As this Court held, the alter ego doctrine concerns only whether one employer succeeded to the labor obligations of another employer whose operations have ceased.

The NMU did not appeal on the single employer issue but did appeal this Court's determination regarding the inapplicability of the alter ego doctrine. On appeal, the Eighth Circuit reversed this Court's conclusion as to the alter ego doctrine and remanded for evaluation of the facts under that doctrine. After considering the previous record as supplemented by the additional evidence adduced at the hearing on remand, this Court concludes that Crest and Clayton are not alter egos of Trinidad and, therefore, are not bound to arbitrate under the NMU/Trinidad Collective Bargaining Agreement.

The purpose of the alter ego doctrine is to prevent employers from escaping obligations through sham transfers or disguised continuation of an old business. *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir.1986); *see also Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718 (1942) (discussing alter ego doctrine in context of employer's attempt to avoid an NLRB reinstatement order). Conversely, when separate business operations do not result from a sham transfer or disguised continuation the non-signatory employer will not be bound by the other corporation's collective bargaining agreement.

Six factors are relevant to whether one employer is another's alter ego. *Crest*, 796 F.2d at 237 (citing *Iowa Express Distribution, Inc. v. NLRB*, 739 F.2d 1305, 1310 (8th Cir.1984), *cert. denied*, 469 U.S. 1088, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984)). These factors look to the substantial identity of the corporations in terms of 1) ownership, 2) management, 3) business purpose, 4) operations, 5) customers, and 6) equipment. *Id.*[2] In addition, anti-union animus

---

**2.** Other courts have included supervision as an additional factor in their alter ego analysis. *See NLRB v. Campbell-Harris Electric, Inc.*, 719 F.2d 292, 295 (8th Cir.1983); *see also Allcoast*, 780 F.2d at 579 (also listing supervision). This

Court does not find the addition of supervision to be a substantial difference. For practical purposes, supervision may be subsumed under management.

may be considered—that is, whether the employer acted out of anti-union sentiment or to avoid a labor contract. *Crest,* 796 F.2d at 237–38 (citing *Iowa Express,* 739 F.2d at 1311). Given the range of potential schemes, the alter ego doctrine is necessarily flexible. *See Campbell-Harris,* 719 F.2d at 296. The application of the doctrine requires a weighing of the various factors with no single factor being dispositive. *See Id.* (lack of identical ownership will not bar a finding of alter ego status); *Nelson Electric v. NLRB,* 638 F.2d 965, 968 (6th Cir.1981) (function of NLRB is to balance the alter ego criteria).

■ The first factor to consider is commonality of ownership. As the plaintiffs admit, Crest, Clayton, and Trinidad are owned commonly by Apex Holding. *Crest,* 605 F.Supp. at 1278; *see Findings of Fact Nos.* 1, 2, 3, and 4.

Second, the Court must consider the extent of common management. Here, the overlap is substantial. Crest, Clayton, and Trinidad share a Board of Directors and several officers. *See Findings of Fact Nos.* 20, 21, 22, 23, and 24. At the operational level, William McHenry, Crest's Fleet Manager, was previously a Port Captain and Operations Manager for Trinidad. *See Findings of Fact No.* 8. Nevertheless, the management and supervision of day-to-day operations at Trinidad is entirely separate from Crest and Clayton. *See Findings of Fact No.* 26.

The third factor to consider is whether the companies share a common business purpose. The bulk of evidence presented at trial following the remand pertains to this issue. As NMU points out, prior to the formation of Crest, Apex Oil chartered five vessels operated by Trinidad; following the formation of Crest, Apex Oil chartered five vessels operated by Crest. From these facts, the defendant infers that Trinidad's operations were siphoned off and transferred to Crest and that Crest and Trinidad share the common business purpose of shipping Apex cargoes.

Upon closer examination, this Court finds the defendant's inference overly simplistic. Trinidad's operations have been more extensive than those of Crest. *See Findings of Fact No.* 27. Moreover, while under charter to Apex the Trinidad vessels carried cargo primarily for other shippers and performed little work for Apex. *See Findings of Fact No.* D. The Apex operations carried out by Trinidad can only be described as sporadic. In addition, Trinidad did not merely transfer its vessels to Crest and Clayton. Rather, the Trinidad T-2's were scrapped, and significantly larger vessels were purchased by the new corporations. *See Findings of Fact No.* 27. Therefore, despite some overlap in operations, the corporations do not share a substantially common business purpose.

The fourth factor is the relationship between the business operations of Trinidad and those of Crest and Clayton. The day-to-day operations of these companies are not related. *See Findings of Fact No.* 26. Similarly, their labor relations operations are separate, *see Findings of Fact No.* 28, as are their headquarters. *See Findings of Fact No.* 26.

The fifth factor is the degree to which Trinidad serves the same customers as Crest and Clayton. This factor is related necessarily to the business purpose of the companies. Each company provided shipping services to Apex. *See Findings of Fact No.* 19. However, the companies served Apex to different degrees. While Crest and Clayton depend entirely upon Apex, Trinidad maintains contacts with other customers and is free to solicit business outside the Apex corporate family. *See Findings of Fact Nos.* 27 and D. Thus, the companies share one customer, Apex, for which Trinidad performed little work.

Sixth, the Court must consider the overlap in equipment between the companies. The T-2 vessels owned by Trinidad were used to carry oil for Apex and other customers. None of these T-2 vessels was transferred to Crest or Clayton; all of these vessels were scrapped. *See Findings of Fact No.* D. The T-2's purchased by Crest and Clayton were significantly larger ships than those used by Trinidad. *See Findings of Fact No.* 27. Regarding the Grand Bassa vessels, Trinidad did refuse an offer to purchase two vessels it operated, and these vessels were later purchased by Crest and Clayton. *See Findings of Fact No.* 12. One of these

vessels was scrapped by Clayton after one voyage. *See Findings of Fact No.* 13. Thus, Clayton now owns one vessel previously operated by Trinidad. Significantly, Trinidad managed the vessel for an independent corporation, but Clayton now owns the ship. *See Findings of Fact No.* 12.

Finally, the Court must consider the degree to which anti-union animus motivated the structuring of the corporate organizations. Novelly concedes that he dislikes unions. *See Findings of Fact No.* G. However, the facts do not indicate that this dislike motivated any transfer of work from Trinidad to Clayton and Crest. In particular, the Court will not infer anti-union sentiment from Trinidad's decision to scrap the T-2's, a decision justified by economic conditions independent of the labor contracts. *See Findings of Fact* D, E, and F.

Next, the Court must balance the mixed evidence presented under the alter ego doctrine. Clearly, Trinidad, Crest, and Clayton are under the common management and ownership of Apex and P.A. Novelly. *See Findings of Fact Nos.* 1, 2, 3, 4, 8, 21, 22, 23, 24, and 26. Clayton and Crest now operate five vessels carrying cargoes for Apex Oil, previously a Trinidad customer. *See Findings of Fact No.* 19. Clayton and Crest perform work for Apex due to their relatively lower operating costs attributable, in part, to non-union labor contracts. *See Findings of Fact* H and I. On the other hand, the day-to-day operations of the companies are unrelated, and the control exercised by Apex is merely the control of a parent corporation with multiple subsidiaries. *See Findings of Fact No.* 26. There is no evidence that Apex did not operate Trinidad as wholly separate from Clayton and Crest. Also, the companies do not share a substantially common business purpose. On balance, this Court concludes that Crest and Clayton are not alter egos of Trinidad.

A review of other alter ego cases confirms this Court's conclusion. These cases reveal far greater consanguinity than is present here. For example, in *NLRB v. Borg Warner Corp.,* 663 F.2d 666 (6th Cir.1981) (per curiam), *cert. denied,* 457 U.S. 1105, 102 S.Ct. 2903, 73 L.Ed.2d 1313 (1982), the Sixth Circuit found alter ego status where a parent corporation had merely transferred work from one subsidiary to another non-union subsidiary. There, the parent corporation created one subsidiary, Pony Express, to take over the courier service of another subsidiary, Wells Fargo, leaving Wells Fargo as a separate entity offering armored car services. Wells Fargo had a union collective bargaining agreement; Pony Express did not. The two companies shared a number of top executives as well as common offices, lock boxes, and post office boxes. The takeover of Wells Fargo's courier services was accomplished by a "paper" sale of assets to Pony Express which then repainted the Wells Fargo vans.

Similarly, *NLRB v. Allcoast Transfer, Inc.,* 780 F.2d 576 (6th Cir.1986), involved three corporations, A.E. Ward, Ward Moving, and Allcoast, found to be alter egos. Harris, served as the Chief Executive Officer and principle shareholder of all three corporations. Harris began his operations with A.E. Ward. This corporation transported goods interstate under its own license, transported goods intrastate, and also transported goods interstate as an agent for Atlas Van Lines. As a result of an Atlas policy change, Harris divided his operations, establishing Ward Moving to ship as Atlas' agent. A.E. Ward continued its independent operations. A further change in Atlas policy required Harris to change the name of A.E. Ward to Allcoast Transfer. Allcoast continued to recognize the collective bargaining agreement executed by A.E. Ward, but Ward Moving did not. The Sixth Circuit found alter ego status based upon the corporations' common management, operations, facilities, equipment and supervisory and operating and employees, and the fact that both Allcoast and A.E. Ward performed shipping as an agent for Atlas.

In *McDonald's Ready-Mix Concrete,* 246 N.L.R.B. 152 (1979), the NLRB held that Jim's Ready Mix was an alter ego of McDonald's Ready-Mix Concrete. There, the principle shareholder of Jim's was a Vice-President and Director of McDonald's, as

well as the son of McDonald's principle shareholder. Essentially, Jim's succeeded to the concrete operations of McDonald's, using the same equipment, employees, and facilities acquired through a sham transfer.

In contrast, Trinidad did not transfer its vessels to crest or Clayton through a "paper" transaction; rather, it sold its vessels as scrap. Crest and Clayton then purchased larger vessels. Thus, the issue is whether it was permissible for Crest and Clayton, instead of Trinidad, to purchase new vessels. This Court finds this decision to be a legitimate entrepreneurial decision outside the ambit of the National Labor Relations Act. *See First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981) (partial shutdown of operations not subject to mandatory bargaining); *Milwaukee Spring Div. of Ill. Coil Spring Co.*, 268 N.L.R.B. 601 (1984) (transfer of work to non-union factory not subject to mandatory bargaining). Similarly, the decision of Trinidad not to exercise its right of first refusal on the Grand Bassa vessels and the decision of Clayton to purchase these vessels is also not subject to mandatory bargaining. The union would reduce these various transactions to a simple comparison between the five ships operated by Trinidad and the five ships operated by Crest and Clayton. This approach ignores the manner in which these transactions were carried out and the substantial differences between these corporations.

For the above reasons, this Court holds that Crest and Clayton are not alter egos of Trinidad and that the plaintiffs are entitled to a declaration that they are not bound by Trinidad's Collective Bargaining Agreement with NMU. In addition, the NMU is enjoined from its efforts to compel Crest and Clayton to arbitrate pursuant to the NMU/Trinidad agreement.