**IOWA EXPRESS DISTRIBUTION, INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 83–1589.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1983.

Decided July 11, 1984.

Rogers, Phillips & Swanger, John R. Phillips, James R. Swanger, Des Moines, Iowa, for petitioner.

Aileen A. Armstrong, Asst. Gen. Counsel for Special Litigation, Lynne E. Deitch, Attorney, N.L.R.B., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel; N.L.R.B., Washington, D.C., for respondent.

Before HEANEY and FAGG, Circuit Judges, and HANSON,* Senior District Judge.

FAGG, Circuit Judge.

Iowa Express Distribution, Inc. (IED) petitions this court for review of an order of the National Labor Relations Board dismissing IED's application for attorneys fees under the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504(c)(2). The issue for review is whether the Board abused its discretion in denying attorneys fees by deciding that the NLRB General Counsel was substantially justified in bringing an unfair labor practice case against IED. The dispute focuses on whether it was reasonable for the General Counsel to allege in its suit that IED was merely an *alter ego* of, or single employer with, Iowa Parcel Service (IPS). We affirm the Board's decision to deny attorneys fees.

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and

I. Background

A. Facts

William K. Walker was the sole stockholder and president of a number of corporations in the trucking industry, including Merchants Delivery Company of Kansas City, Missouri. In 1978, Merchants acquired IPS, a common carrier serving 13 states in the Midwest with its main terminal in Des Moines, Iowa, and additional terminals in Waterloo, Iowa, and Omaha, Nebraska. Employment conditions at IPS were governed by collective bargaining agreements between IPS and Teamsters Local 90 in Des Moines and Teamsters Local 554 in Omaha. Because IPS was losing money, Walker decided to halt operations temporarily on March 23, 1981, and directed that the terminal gates be locked. On April 14, Walker permanently discontinued the operations of IPS.

Two long-time managers of IPS, Harold Sternberg and Randy McElroy, decided to go into business for themselves when they learned from Walker in early February 1981 that IPS would not likely continue in business. Walker encouraged Sternberg and McElroy to start their own company, and in lieu of severance pay, gave them a $25,800 interest-free loan to get them started. On March 4, 1981, IED's certificate of incorporation was filed, listing only Sternberg and McElroy as shareholders, directors, and officers. Walker was never an IED shareholder, director, or officer. Before resigning from IPS, Sternberg solicited several IPS pool customers for the new venture.

The scope of IED's operations was substantially more limited than IPS. IPS had served 1000 communities in Iowa and also had served 12 other midwestern states. IED served only 35 Iowa communities and the Omaha and Rock Island, Illinois areas. IPS's annual revenues in 1980 had exceeded $7 million. After eight months of operations, IED's revenues were $266,042. IPS had employed 90 drivers and dockworkers.

Southern Districts of Iowa, sitting by designation.

IED employed only five drivers, who were referred to it by the Iowa employment office. No former IPS employees sought employment with IED. As the administrative law judge noted, however, IED's business was "identical in type if not in scope to a portion of IPS's operations."

### B. Procedural History

The General Counsel of the NLRB issued an unfair labor practice complaint alleging that IED, as an alter ego of, or single employer with, IPS and its president, William K. Walker, violated sections 8(a)(1), (3) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) and (5). The complaint alleged that IPS had locked out and discharged its employees at IPS's Des Moines, Iowa facility, closed that facility, and transferred some of its operations to IED, while refusing to continue in effect its collective bargaining agreement with Teamsters Local 90. The complaint also alleged that IPS had closed its Omaha, Nebraska facility, discharged its employees, transferred its work to IED, and refused to bargain with Teamsters Local 554. After a four-day hearing, an administrative law judge found IPS guilty of the unfair labor practices alleged but recommended that the complaint against IED be dismissed. The administrative law judge found that the General Counsel's evidence, "while warranting grave suspicion," failed to establish that IED was an alter ego of, or single employer with, IPS. The Board adopted the administrative law judge's recommended order and dismissed the complaint against IED.

As a "prevailing party" IED then applied for $27,138.38 in attorneys fees and expenses pursuant to the EAJA. The same administrative law judge who dismissed the unfair labor practice complaint against IED also dismissed IED's application for attorneys fees, stating that "the evidence which General Counsel had in its possession justified its issuance of the complaint against the Applicant [IED] as well as IPS and Walker and warranted litigation." He concluded that "the General Counsel present-

ed, if not a *prima facie* case, a case which still had a substantial basis in fact and law." The Board upheld the administrative law judge's dismissal of the application for attorneys fees and IED filed its petition for review with this court.

## II. Equal Access to Justice Act

### A. Overview

 The Equal Access to Justice Act, 5 U.S.C. § 504, provides that an agency shall award attorneys fees and expenses to a prevailing party in connection with an agency adversary adjudication "unless the adjudicative officer of the agency finds that the position of the agency as a party to the proceeding was substantially justified." 5 U.S.C. § 504(a)(1). "[T]he test of whether the position of the United States is substantially justified is essentially one of reasonableness in law and in fact. The government bears the burden of proving the substantial justification of its position." *Foley Construction Co. v. U.S. Army Corps of Engineers,* 716 F.2d 1202, 1204 (8th Cir.1983). "The government must therefore show that there is a reasonable basis in truth for the facts alleged in the pleadings; that there exists a reasonable basis in law for the theory it propounds; and that the facts alleged will reasonably support the legal theory advanced." *United States v. 2,116 Boxes of Boned Beef,* 726 F.2d 1481, 1487 (10th Cir.1984). "Where the government forces a party into 'lengthy administrative proceedings' before final vindication of his or her rights ... the government should have to make a strong showing ... that its action was reasonable.' " *Cornella v. Schweiker,* 728 F.2d 978, 982 (8th Cir.1984), *quoting* H.R.Rep. No. 1418, 96th Cong. 2d Sess. 18, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4997. An administrative agency's fee determination under the EAJA may only be modified if there is an abuse of discretion. 5 U.S.C. § 504(c)(2).

### B. "Position of the United States"

Considerable uncertainty has surrounded the question of which government position

must be substantially justified. Several courts have concluded that the government position referred to in the EAJA is its position in litigation. *See, e.g., United States v. 2,116 Boxes of Boned Beef, supra,* 726 F.2d at 1487; *Spencer v. NLRB,* 712 F.2d 539, 556–57 (D.C.Cir.1983); *Electronic Modules Corp. v. United States,* 702 F.2d 218, 219 (Fed.Cir.1983). Other courts have held that the government position referred to in the EAJA is the underlying governmental action that precipitated the litigation. *See, e.g., Natural Resources Defense Council v. U.S.E.P.A.,* 703 F.2d 700, 707 (3d Cir.1983); *Moholland v. Schweiker,* 546 F.Supp. 383, 386 (D.N.H. 1982); *Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348, 352 (D.D.C.1982). *See also Tyler Business Services, Inc. v. NLRB,* 695 F.2d 73, 75 (4th Cir.1982) (cited for both litigation and underlying action theories; *compare United States v. 2,116 Boxes of Boned Beef, supra,* 726 F.2d at 1487, *with Rawlings v. Heckler,* 725 F.2d 1192, 1195 (9th Cir.1984)). The Ninth Circuit, noting its preference "for the broader 'underlying action' theory," has recently concluded that the government's position should be determined by "considering the totality of the circumstances prelitigation and during trial." *Rawlings v. Heckler, supra,* 725 F.2d at 1195–96. The Eighth Circuit has not yet decided which government position—litigation or prelitigation—is to be considered to determine substantial justification under the EAJA. We have observed, however, that "[i]n most cases 'it makes no functional difference how one conceives of the government's "position"' because 'the litigation position of the United States will almost always be that its underlying action was legally justifiable.'" *Foley Construction Co. v. U.S. Army Corps of Engineers, supra,* 716 F.2d at 1204, *quoting Spencer v. NLRB, supra,* 712 F.2d at 551–52.

The statute itself does not define the term "position of the United States". The legislative history, which has been thoroughly examined in previous opinions, is inconclusive as to which position is to be examined. *See, e.g., Cornella v. Schweiker, supra,* 728 F.2d at 982; *Rawlings v.*

*Heckler, supra,* 725 F.2d at 1195; *Spencer v. NLRB, supra,* 712 F.2d at 547–49; *Natural Resources Defense Council v. USEPA, supra,* 703 F.2d at 707–12. The references in the legislative history to the government's position at both the agency and litigation levels suggest to us, however, that Congress was concerned with unreasonable government activity at whatever level it was encountered. *See Rawlings v. Heckler, supra,* 725 F.2d at 1195. We must also consider the purpose of the EAJA to determine the meaning of the government's "position." If we were to limit our consideration of the government's position to merely the stance taken in litigation, no matter how outrageous the underlying governmental action, the government would be absolved from liability if Justice Department litigators acted reasonably. *See, e.g., Rawlings v. Heckler, supra,* 725 F.2d at 1196; *Natural Resources Defense Council v. USEPA, supra,* 703 F.2d at 707; *Environmental Defense Fund, Inc. v. Watt,* 554 F.Supp. 36, 41 (E.D.N.Y.1982). The litigation position approach does not address what we must conclude is at least a significant purpose of the EAJA—to encourage government regulatory agencies only to take actions that have a reasonable basis in law and in fact.

■ We feel that the purpose of the EAJA is best served by interpreting position of the United States to include the government's position at both the prelitigation and litigation levels. We concur in the observation of the court in *Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348 (D.D.C. 1982):

> [T]he Act is intended to proscribe frivolous government action that forces a party to resort to the courts to redress its rights. It would contradict the remedial purpose of the Act to interpret it to isolate and focus upon the reasonableness of only a single element of the government's actions, when the *entire factual background* may suggest a contrary conclusion.

*Id.* at 352 n. 7 (emphasis added). The Ninth Circuit has concluded "that the reme-

dial purpose of the EAJA is best served by considering the totality of the circumstances prelitigation and during trial." *Rawlings v. Heckler, supra,* 725 F.2d at 1196. We agree that the totality of the circumstances—prelitigation and litigation—must be considered to determine whether the position of the United States is substantially justified. Considering the totality of the circumstances in this case, we observe that the government's position has been consistent both at the prelitigation and litigation levels: the government. has continuously maintained the merit of its position that IED was an alter ego of, or single employer with, IPS.

### III. Single Employer/Alter Ego Doctrines

■ The central issue in this case is whether it was reasonable for the General Counsel to bring an unfair labor practices complaint against IED. In the complaint, the General Counsel relied upon alternative theories that IED was either an alter ego of, or single employer with, IPS. Although the single employer and alter ego doctrines are related, they are conceptually distinct. *See Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 24 (1st Cir.1983); *Naccarato Construction Co.,* 233 NLRB 1394, 1398–99 (1977). The single employer doctrine is a Board creation that treats two or more related enterprises as a single employer for purposes of holding the enterprises jointly to a single bargaining obligation or for the purpose of considering liability for any unfair labor practices. *See Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d 489, 504–05 (5th Cir.1982). Four factors are considered to determine whether two distinct business entities are to be treated as a single employer for purposes of the National Labor Relations Act: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965); *NLRB v. G.H.R. Energy Corp.,* 707 F.2d 110, 113 (5th Cir.1982); *Penntech*

*Papers, Inc. v. NLRB, supra,* 706 F.2d at 25; *Mastell Trailer Corp. v. NLRB,* 682 F.2d 753, 754 (8th Cir.1982). No one of these factors is controlling nor need all criteria be present; single employer status is a factual question that ultimately depends upon all the circumstances of the individual case. *Penntech Papers, Inc. v. NLRB, supra,* 706 F.2d at 25; *NLRB v. DMR Corp.,* 699 F.2d 788, 791 (5th Cir. 1983).

■ While the single employer doctrine focuses on whether two or more existing business entities should jointly be held to a single labor obligation, the alter ego doctrine focuses on whether one business entity should be held to the labor obligations of another business entity that has discontinued operations. *See* Note, *Bargaining Obligations After Corporate Transformations,* 54 N.Y.U. L. Rev. 624, 638 (1979). The essential inquiry under the alter ego analysis is "[w]hether there was a *bona fide* discontinuance and a true change of ownership * * * or merely a disguised continuance of the old employer." *Southport Petroleum Co. v. NLRB,* 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942). To determine whether one enterprise is an alter ego of another, many of the same factors are considered as in the single employer analysis: whether there is substantially identical ownership, management and supervision, business purpose, operation, customers, and equipment. *See Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc., supra,* 690 F.2d at 507. Another factor that is considered is whether there is a substantial continuity of the work force from the union to the non-union employer. *Id.* at 508. Of these factors, one of the most important is the existence of continued control or ownership by the owner of the discontinued company. *NLRB v. Bell Company, Inc.,* 561 F.2d 1264, 1267–68 (7th Cir.1977). "[T]he focus of the alter ego doctrine. unlike that of the single employer doctrine, is on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agree-

ment, such as through a sham transfer of assets." *Penntech Papers, Inc. v. NLRB, supra,* 706 F.2d at 24; *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc., supra,* 690 F.2d at 508. "Unlawful motive or intent are critical inquiries in an alter ego analysis, inquiries which are wholly absent in a single employer analysis." *Penntech Papers, Inc. v. NLRB, supra,* 706 F.2d at 24; *NLRB v. Tricor Products, Inc.,* 636 F.2d 266, 270 (10th Cir.1980). *See also N.Y.U. L. Rev.* Note, *supra* at 639 ("for an alter ego finding * * * the employer must act from anti-union animus"). When an alter ego finding is made, a non-signatory enterprise will be held bound to the collective bargaining agreement entered into by the signatory enterprise. *See Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc., supra,* 690 F.2d at 508–09; *Sturdevant Sheet Metal & Roofing Company, Inc. v. NLRB,* 636 F.2d 271, 274 (10th Cir.1980).

## IV. Analysis

 Our decision hinges on whether it was reasonable for the General Counsel to assert that IED was an alter ego of, or single employer with, IPS. In this case, we feel that the alter ego doctrine is more appropriate than the single employer doctrine. The General Counsel did have considerable evidence supporting alter ego status. IED was formed by two high ranking and long term managerial employees of IPS. Sternberg had once been an officer of IPS. McElroy and Sternberg formed IED with Walker's encouragement while IPS was still in business. Walker provided the initial financing for IED with an unsecured, no-interest loan. Sternberg solicited the business of some of IPS's customers for IED while he was still working at IPS, and he did so with Walker's knowledge and consent. IED's business was identical in type to a portion of IPS's operations. IED used some of IPS's equipment when it first began. Most importantly, as the administrative law judge noted, "Walker had expressed an attitude toward his unionized employees from which one could conclude that he would have gone to almost any

length to achieve his objective in regard to them." It is significant that Walker, Sternberg and McElroy all made statements indicating that IED was created only to preserve certain pool shipment business until IPS reopened. Indeed, there was testimony that Walker stated that IED was "my little device that I have created to hold the pool shipments until we go back to work at Iowa Parcel." At another time, Walker, referring to IED, purportedly told someone to "leave my little company alone." The evidence, taken as a whole, tended to establish that the operations of IED and IPS were interrelated, that there was a significant degree of common management, and at least to the extent of the initial financing, that Walker had a financial interest in IED. Moreover, the surrounding circumstances suggested that IED may have been formed specifically to avoid the labor obligations of IPS, a consideration that is at the heart of the alter ego inquiry.

We recognize, of course, that there was significant evidence to suggest that IED was not an alter ego of IPS. There was no substantial identity of ownership between IED and IPS. Indeed, Sternberg and McElroy owned no interest in IPS and Walker owned no interest in IED. Although there was evidence that IED was formed for Walker's benefit—that is, to preserve certain pool accounts—there was no evidence to show that Walker exercised any control over the day-to-day management of IED. IED had only a very small portion of IPS's former business. Finally, there was no substantial continuity of the work force from IPS to IED.

One troubling aspect of this case is IED's contention that the General Counsel's investigation was inadequate and violated the Board's own procedures. Had there been an adequate investigation, IED contends, no complaint would have issued. The General Counsel has done little to deny the charge that there was no more than a cursory investigation before the unfair labor practices complaint against IED was filed. It is a matter of considerable concern if indeed the General Counsel failed to

perform its duty, according to its own rules, to pursue a proper investigation before bringing suit. Nevertheless, our review is limited to whether there was information available to the General Counsel that would have disproved the claim that IED was an alter ego of IPS, thus making the General Counsel's position unreasonable.

IED points to the following documents which it feels show conclusively that IED and IPS were unrelated: (1) the IED articles of incorporation showing that neither IPS nor Walker was connected with IED; (2) the IPS articles of incorporation showing that neither IED, Sternberg nor McElroy was a principal in IPS; (3) IED's lease for premises separate from IPS; (4) IED's invoices for rental of its own equipment; and (5) I.C.C. decisions granting IED independent operating authority. Certainly all of these documents are evidence of the separate existence of IED and IPS. None of this evidence, however, is in any way conclusive. Indeed, the General Counsel's argument at the hearing was not so much that distinct corporate forms had not been recognized, but rather that IED, although formally separate from IPS, had been created merely as a device of Walker's to hold onto business until he straightened out his problems with the local unions at IPS. *See Scott Printing Corporation,* 237 NLRB 593, 601 (1978) ("corporate forms, being largely paper arrangements, do not always reflect the business realities of a given situation"). Given the evidence available to the General Counsel, this was a plausible, if ultimately incorrect theory. We believe that the government's case against IED had a reasonable basis in fact.

The administrative law judge concluded that in this case the General Counsel advanced, in good faith, a "novel but credible extension and interpretation of the law." *See* H.R.Rep. No. 1418, 96th Cong., 2d Sess. 11 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 4953, 4990. The administrative law judge observed that "it was arguable" and he "could have inferred, that Walker's financial support of the Applicant [IED], in light of the statements made by the various participants, gave him continued actual control over the Applicant such as would establish *alter ego* status notwithstanding the absence of other evidence of 'substantially identical' ownership."

Although the government's theory was rejected by the administrative law judge, the General Counsel relied on a nucleus of Board decisions which provided plausible support for the argument that IED was an alter ego of IPS. *See American Pacific Concrete Pipe Company, Inc.,* 262 NLRB 1223 (1982) (alter ego relationship found without common ownership where substantially identical business purpose, operations, equipment, type of customer, and common control of labor relations existed); *Big Bear Supermarkets No. 3,* 239 NLRB 179 (1978); *Circle T Corporation,* 238 NLRB 245 (1978); *Ramos Ironworks, Inc.,* 234 NLRB 896 (1978) (although legal ownership of the two corporations was distinct, alter ego relationship found where corporations had common business purposes and operational control). Although the common ownership element was missing in these cases, the Board nevertheless made findings of alter ego status. In *Circle T Corporation, supra,* the Board considered a situation similar to what the General Counsel was attempting to show in this case, "with the closure and subsequent reopening [of a new corporation] being no more than an effort by a firm losing money to be rid of the costs of unionization." *Id.* at 246. The Board found especially relevant the evidence that the sole owner of Circle T Corporation had told an employee that "Circle T was going to be out of business in 4 or 6 weeks, that he had plans to start another company, and that this was being done as a 'maneuver' to get the Union out." *Id.* These comments that the Board found relevant are, of course, very similar to the comments credited to Walker in this case, indicating that IED was just a device of his to hold onto business until his union problems were straightened out. Although the case against IED may not have been as strong for alter ego status as in

these Board decisions, nevertheless, the legal theory advanced by the General Counsel was not unreasonable within the framework of the EAJA.

Accordingly, we hold that the Board did not abuse its discretion in denying attorneys fees because the General Counsel was substantially justified in asserting that IED was an alter ego of IPS.

Affirmed.