**John M. SMITH, Petitioner,**

v.

**NATIONAL TRANSPORTATION SAFETY BOARD, Respondent.**

No. 92–3201.

United States Court of Appeals, Eighth Circuit.

Submitted March 17, 1993.

Decided May 11, 1993.

**850**

Robert Konchar, Cedar Rapids, Iowa, argued (Robert E. Konchar, Mark J. Herzberger and Paul D. Gamez on the brief), for petitioner.

Clarence Butcher, Washington, DC, argued (Allan H. Horowitz and Clarence C. Butcher, Jr., on the brief), for respondent.

Before BOWMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

John Smith petitions for review of the National Transportation Safety Board's ("the Board") denial· of his request for attorney fees. We reverse the Board's order.

---

**1.** A near miss occurs when there is less than 1,000 feet, in any direction, between two or more aircraft.

## I. BACKGROUND

On October 1, 1987, Smith, an experienced pilot with a previously unblemished flying record, left Cedar Rapids for Des Moines. Smith had made this trip on numerous occasions in the past. The Cedar Rapids air traffic controller issued Smith an altitude of 8,000 feet, and, after repeating the instruction, Smith leveled his plane at 8,000 feet. After instructing Smith to alter his heading (which he did), the Cedar Rapids air traffic controller told Smith to change his frequency to the Chicago Center.

Each controller in the Chicago Center is assigned a different sector. Smith was flying in the sector that encompassed a large portion of Iowa, including Des Moines, Waterloo, Ottumwa, and Cedar Rapids. On the day in question, this sector was saturated (meaning it had more air traffic than usual) because Waterloo's radar was inoperative and Chicago Center was handling the takeoffs and landings in Waterloo.

Within each sector, there are two controllers. One controller works at the radar position and the other controller works at the manual position. The radar position communicates with the aircraft in the sector, while the manual position communicates primarily with ground positions in the sector. In addition, when necessary, the manual controller assists the radar controller. The communications made by both controllers are recorded separately; however, the manual controller's recording will record communications made by the radar controller whenever the manual controller is not communicating with anyone.

On the day in question, the radar position for the sector in which Smith was flying was manned by Kraig Zibolski, a trainee. He was being supervised by the manual controller, Chester Calhoun. Smith claims he received an instruction from Zibolski to descend to 4,000 feet. After acknowledging and repeating the instruction, Smith began to comply with it. Upon reaching an altitude of 5,200 feet, a near miss alarm[1] sounded in Chicago Center. After the alarm sounded,

Calhoun contacted Smith and, in what can be charitably described as "unprofessional" and "colorful" language, asked Smith what he was doing and ordered him to maintain an altitude of 5,000 feet.

The incident was investigated by Ward Huston. Huston relied primarily on statements made by Zibolski and Calhoun and a tape recording of the manual side. A tape of the radar side was filled with static and, consequently, useless. The manual side did not record the command Smith alleged had been made by Zibolski.[2] Huston's report and a copy of the manual tape were forwarded to Thomas Wood, who, after reviewing the report and information, solicited a response from Smith. Upon receiving the response, Wood recommended that Smith's license be suspended for sixty days for his violations of 14 C.F.R. §§ 91.75(a) & (b) (1987) (prohibiting deviation from air traffic controller's instructions), § 91.9 (prohibiting careless or reckless operation of aircraft), and § 61.3(c) (requiring pilots to have a current medical certificate).[3]

Both Huston and Wood testified at the administrative hearing. They testified that it was extremely rare to proceed in a case such as this without the radar side tape; in fact, neither of them could recall such an occasion. Wood testified that, at the time he recommended that Smith's license be suspended, he was not aware the manual tape would record the radar side's transmissions only if the manual side was not talking on the radio. Additionally, neither Huston nor Wood was aware that the sector in question was saturated. Zibolski and Calhoun also testified and denied that Smith was instructed to descend to 4,000 feet. In addition, Zibolski testified that after being relieved, he and Calhoun went to the room where the recording equipment was located. The record reveals no explanation as to why they did this. Smith testified in his defense and explained that he had received an instruction to de-

scend to 4,000 feet and had complied with that order.

In findings delivered from the bench, the administrative law judge (ALJ) determined that Smith had received the instruction to descend and therefore had not committed any violations when he descended. The FAA filed a notice of appeal with the Board, but later withdrew it; subsequently, Smith filed a motion for attorney's fees under 5 U.S.C. § 504(a)(1) (1988). The ALJ granted Smith's request, stating in pertinent part that

> the mere fact that I did not believe the controllers' testimony does not *ipso facto* mean that the FAA's decision to take action against [Smith] was not substantially justified. However, taken in combination with the controllers' appearance in the taping room right after the incident, the fact that the radar tape was nothing but static, the belligerent and unprofessional tenor of Mr. Calhoun's communications with [Smith] all lead to the obvious and ineluctable conclusion that they were trying to cover their tracks by constructing a scenario that would point away from any wrongdoing on their part in giving the 4,000 foot amended clearance.

*Smith v. Busey,* No. 70–EAJA–SE–9242, slip op. at 5 (Feb. 28, 1990) (ALJ's Initial Decision and Order Granting Application for Attorney Fees and Other Expenses). The FAA appealed this decision to the Board, which granted the appeal and reversed the ALJ. Smith then petitioned for review in this court.

## II. DISCUSSION

█ As a prevailing party, Smith was entitled to an award of attorney fees unless "the position of the agency was substantially justified or ... special circumstances make an award unjust." 5 U.S.C. § 504(a)(1) (1988). Whether the agency's position was substantially justified is determined by examining

---

**2.** There was no problem with the manual tape. Therefore, the fact that the command was not recorded on the manual tape means either 1) the command was never made or 2) Calhoun was communicating with someone at the time Zibolski ordered Smith to descend.

**3.** This latter violation was included because Smith was two days late in renewing his medical certificate. No sanction was imposed because of this violation, and the Board does not contend this violation prevents Smith from being a "prevailing party" as required by 5 U.S.C. § 504(a)(1) (1988). The inclusion of this charge plays no role in our decision.

the administrative record as a whole. *Id.* The decision of the Board, and not the ALJ, is the final agency decision subject to our review, *id.* § 504(a)(3), and we can modify the Board's decision only if we find "the failure to make an award of fees and other expenses ... was unsupported by substantial evidence." *Id.* § 504(c)(2).

The government's position is supported by substantial evidence if it is "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). Stated in other words, "[t]he government must ... show that there is a reasonable basis in truth for the facts alleged in the pleadings; that there exists a reasonable basis in law for the theory it propounds; and that the facts alleged will reasonably support the legal theory advanced." *United States v. 2,116 Boxes of Boned Beef,* 726 F.2d 1481, 1487 (10th Cir.), *cert. denied sub nom. Jarboe–Lackey Feedlots, Inc. v. United States,* 469 U.S. 825, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984) (cited with approval in *Pierce,* 487 U.S. at 566, 108 S.Ct. at 2551 and *Iowa Express Distrib., Inc. v. National Labor Relations Bd.,* 739 F.2d 1305, 1308 (8th Cir.), *cert. denied,* 469 U.S. 1088, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984)). After examining the entire record, we do not believe there was substantial evidence to reasonably support the facts alleged by the FAA in this case.

▪ Under most circumstances, it would be reasonable for a governmental agency to rely on the statements of its employees. This is true even when, as in this case, the employees have a vested interest in the outcome.[4] However, this case does not fit in the category of "most circumstances." Chicago Center had a recording device designed specifically to record the conversations between controllers and pilots. This case was unique in that, according to the FAA officials testifying at the administrative hearing, no case of this type had ever been prosecuted without that recording being available as evidence. Stranger still, nobody knows why the tape

was filled with static. The inexplicable presence of static is a matter of great concern given the fact that Calhoun and Zibolski went to the tape room at their first opportunity. The Board insists there was no evidence of tampering, but this statement is not particularly meaningful given that there was no evidence of *any* reason for the static-filled tape and no indication the FAA investigators tried to find out what had happened to cause what they knew to be a most peculiar occurrence. Moreover, the tape was under the management and control of the FAA, not the pilot.

After viewing the record as a whole through the lens of reasonability, the following combination of facts is presented: 1) biased witnesses were inexplicably present, alone, with a piece of equipment designed to record exactly what was said, 2) the equipment failed for the first time in the memory of the FAA inspectors, 3) the FAA did not deem the conjunction of these events worthy of any investigation. Additionally, the person responsible for giving commands to the pilots was a trainee, who was working in a saturated sector. The fact that the trainee was working in a saturated sector is highly relevant to the controllers' credibility, yet the people responsible for deciding what to do about the incident never knew the sector was saturated. In short, the record as a whole gives rise to a strong suspicion that, as stated by the ALJ, "something was 'wrong in the state of Denmark,'" *Smith,* No. 70–EAJA–SE–9242, slip op. at 5.,[5] but the FAA chose to ignore certain facts and simply failed to discover others. Consequently, we hold there is not substantial evidence to support the Board's decision that the FAA's decision to proceed based solely on the statements of Zibolski and Calhoun was substantially justified.

## III. CONCLUSION

The Board's decision that the FAA's prosecution of case was substantially justified is

---

4. The FAA could have attributed the error to either the pilot or the controllers. Presumably, it is not favorable for a controller (and, in particular, a controller-in-training) to be blamed for a near-miss.

5. *See Hamlet,* act I, sc. iv ("Something is rotten in the state of Denmark.").

reversed. Because there has not been any argument that the ALJ's calculations were flawed, we adopt her monetary figures and order payment of Smith's attorney's fees in the amount of $16,828.58 and expenses in the amount of $3,733.44, for a total award of $20,562.02.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

With respect, in order to reach its result, the court constructs a conspiracy from entirely equivocal facts and then faults the government for not doing the same. Electronic equipment fails, and, even if it were not the common experience of humanity that it did, the court offers no explanation of how Mr. Zibolski and Mr. Calhoun could have possibly caused static to appear on a tape. (If a tape is erased, it contains nothing, not static.) It is, moreover, a reasonable inference that one rarely sees prosecutions presenting these kinds of circumstances because these kinds of circumstances are themselves unusual. The court also finds it somehow suspicious that Mr. Zibolski and Mr. Calhoun repaired to the room where the recording equipment was located immediately after the material events in issue. But this behavior is completely consistent with an entirely innocent motive, namely, a desire to secure evidence that will support what one knows to be true.

It is not our task, of course, to decide whether Mr. Zibolski and Mr. Calhoun in fact contrived a plan to cover up their own errors. What we have to decide is whether the government was substantially justified in believing that they did not and in prosecuting Mr. Smith. As the court today itself recognizes, our question is whether the government was "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). What the court holds today, in essence, is that no reasonable fact-finder could conclude that Mr. Zibolski and Mr. Calhoun had not contrived a case against Mr. Smith. It seems manifest to me that reasonable persons could differ over that question.

The result that the court reaches today puts an unreasonable burden on an agency charged with important responsibilities that directly affect the safety and welfare of the travelling public. I cannot conscientiously join in that holding.

I therefore respectfully dissent.