# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

————————

No. 07-2334

————————

National Labor Relations Board,     *
                                     *

           Petitioner,            *

                                        *     Petition for Enforcement

      v.                              *     of an Order of the

                                        *     National Labor Relations Board.

Bolivar-Tees, Inc; Screen            *
Creations, Ltd.; Screen Creations     *
de Mexico; Screen Creations de      *
Celaya; Single Employers; Allan      *
Heller,                                  *

                                        *

          Respondents.          *

————————

Submitted: February 15, 2008
Filed: June 4, 2008

————————

Before MELLOY, GRUENDER and SHEPHERD, Circuit Judges.

————————

GRUENDER, Circuit Judge.

The National Labor Relations Board ("Board") held that Bolivar-Tees, Inc. ("Bolivar") committed unfair labor practices in violation of the National Labor Relations Act ("NLRA") and ordered the corporation to provide backpay to five former employees. However, when the United States Court of Appeals for the District of Columbia Circuit enforced the order, Bolivar was dissolved and had disposed of all

of its assets. In a subsequent compliance proceeding, an administrative law judge ("ALJ") recommended that Screen Creations, Ltd. ("Screen Creations"), Screen Creations de Mexico, Screen Creations de Celaya and Allan Heller be held jointly and severally liable with Bolivar because the corporations constituted a single employer and because the corporate veil should be pierced to allow collection from Heller personally. The Board filed a petition for the enforcement of its Supplemental Decision and Order ("Order"), which adopted the recommendations of the ALJ. We grant the petition and enforce the Order.

## I.    BACKGROUND

Screen Creations, incorporated in Missouri by Heller's father, made custom, screen-printed tee-shirts. Upon receiving a tee-shirt order from a customer, Screen Creations would purchase the fabric and contract with another entity to cut and sew the fabric into a tee-shirt. The contracted entity would then provide the finished garment to Screen Creations, which would screen print the tee-shirt and ship the final product to the customer. Heller became sixty percent owner of Screen Creations while his father maintained a forty percent interest in the corporation. Heller also exercised overall managerial control of the corporation's operations and was its only officer and director from 1999 to 2003, except for 2002, when the company's annual report also listed Heller's father as one of the directors. Heller drew an average annual salary from Screen Creations of approximately $192,000 from 1990 to 1997, and approximately $120,000 from 2000 to 2003.[1]

In an effort to consolidate the production process, Heller incorporated Bolivar in March 1990 to cut and sew fabric into tee-shirts exclusively for Screen Creations.

---

[1]From 1990 to 1997, Screen Creations paid Heller a salary of $226,250, $156,800, $245,850, $219,000, $134,000, $107,000, $224,750 and $224,750, respectively. From 2000 to 2003, he received $187,000, $99,750, $90,240 and $103,600, respectively. Heller's salary for 1998 and 1999 was not part of the record.

Heller was Bolivar's sole owner, officer and director. At Bolivar's inception, Heller borrowed $170,000 from Screen Creations in return for a promissory note dated March 26, 1990. He used the money to purchase cutting and sewing equipment from one of Screen Creations' subcontractors. Heller then had Bolivar purchase this equipment from him with its promissory note for $170,000. Both promissory notes provided for ten percent interest, payments starting on December 31, 1990, and payment of the remaining principal balance by 1995. Throughout its existence, Bolivar purchased additional equipment, using $501,218 of its own funds.

Bolivar consistently suffered financial difficulties. The amount Bolivar charged Screen Creations for the tee-shirts it manufactured did not cover its basic operating costs. As a result, Bolivar made no payments to Heller on the promissory note, and Heller similarly made no payments to Screen Creations. With interest accruing on the promissory note, Bolivar's books indicated that it owed Heller $357,438 by 2000. Screen Creations, which was generally profitable, also regularly advanced operating funds to Bolivar. By 2001, Bolivar's books also reflected that it owed $202,741 to Screen Creations.

Even beyond the advances, Screen Creations and Bolivar were closely connected financially. In 1997, Screen Creations revised its profit-sharing plan to include Bolivar's employees. From 1999 to 2001, the two corporations were insured under an insurance policy issued to Screen Creations. The policy covered Bolivar's equipment in the amount of $550,000. Finally, Screen Creations, and not Bolivar, provided Heller with a salary and insurance benefits.

In 1998, charges were brought against Bolivar for unfair labor practices. After a hearing, an ALJ found that Bolivar unlawfully suspended and discharged five employees in violation of section 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1), (3). The Board issued an order requiring Bolivar to reinstate the former employees and to make those employees "whole for any loss of earnings and other benefits

suffered as a result of the discrimination." *Bolivar Tee's Mfg. Co.*, 334 N.L.R.B. 1145, 1159 (2001) (affirming the ALJ's September 24, 1998 decision). The United States Court of Appeals for the District of Columbia Circuit granted the Board's petition for the enforcement of that order. *Bolivar Tee's Mfg. Co. v. NLRB*, 61 Fed. Appx. 711 (D.C. Cir. 2003) (unpublished per curiam). The Board has since calculated the amount of lost earnings and benefits due to the five discriminatees, concluding that Bolivar owes $96,399.15 in backpay. *Bolivar-Tees, Inc.*, 349 N.L.R.B. No. 70, at *4 (2007).

According to Heller, the North American Free Trade Agreement ("NAFTA") made textile manufacturing unprofitable in the United States but economically advantageous in Mexico. In 1999, Heller began moving Bolivar's equipment to Mexico. In February 2000, Heller incorporated Screen Creations de Mexico, a Mexican corporation, and was a fifty percent owner, the president and a member of its board of directors. By October 20, 2000, Heller had moved all of Bolivar's equipment to Screen Creations de Mexico. Screen Creations de Mexico never paid Bolivar for the equipment or for its use of the equipment.

Heller claims that he transferred the legal title of Bolivar's equipment to Screen Creations and that Screen Creations paid for the equipment by reducing the debt Bolivar owed it on January 1, 2001. Heller did not have Bolivar's equipment appraised at the time of the transfer and did not provide any documentation regarding the change in legal title. Although Bolivar purchased the equipment for $671,218 and it was insured for $550,000, Bolivar's 2001 tax return recorded the transfer as a sale of the equipment in the amount of $225,000, a figure that Heller claims he and his accountant arrived upon after "we went through various scenarios and talked about market conditions, book value and other issues." Screen Creations never actually paid Bolivar. Instead, Heller asserts that the transfer was a "paper transaction," where Bolivar's debt to Screen Creations was reduced by $225,000. However, according to Bolivar's 2001 tax return, Bolivar's debt to Screen Creations was reduced by

-4-

$122,573, not the full $225,000. With respect to the $102,427 difference, Heller asserts that Screen Creations must have advanced an additional $102,427 during the 2001 tax year. Heller, however, did not provide any documentary evidence supporting this claim.

Bolivar's equipment was its only asset. With no assets left, Bolivar ceased operations in July 2001. In October 2004, the State of Missouri officially dissolved Bolivar for failure to file a 2004 annual registration report. In November 2004, Screen Creations de Mexico also ceased operations. Heller then sent the Bolivar equipment to a Mexican corporation named Confecciones Guanajuanto ("Confecciones"). Heller had no ownership interest in Confecciones, and Confecciones paid no compensation for the use of the equipment. However, Heller hoped to receive future compensation from Confecciones through commissions on product sales.

Screen Creations' operations also moved to Mexico. In November 2001, Heller incorporated Screen Creations de Celaya to conduct the custom screen printing. Heller was a sixty-five percent owner, the president and a member of its board of directors. Heller transferred eighty to ninety percent of Screen Creations' equipment to Screen Creations de Celaya, although the title to the equipment remained with Screen Creations. Screen Creations de Celaya did not pay any compensation for the use of the equipment. Heller claims that Screen Creations de Celaya forwarded a portion of its profits to Screen Creations, although no agreement existed for such payments and no evidence was presented that Screen Creations de Celaya actually made such payments.

By April 2003, Screen Creations ceased all production work and became a service business that engaged in sales and technical assistance to Screen Creations de Mexico and Screen Creations de Celaya, although it has not been compensated for these services. In October 2004, the State of Missouri administratively dissolved Screen Creations for failure to file a 2004 annual registration report. Nonetheless,

Screen Creations continues to operate, and Heller is the corporation's only remaining employee. Heller claims that he has loaned more than $300,000 to Screen Creations between 2001 and 2004.

Before Heller transferred Bolivar's assets, Bolivar did not attempt to satisfy the unfair labor practice award against it. In an attempt to collect on the backpay due, the Board issued a compliance specification against Bolivar, Screen Creations, Screen Creations de Mexico, Screen Creations de Celaya and Heller. *See Bolivar-Tees, Inc.*, 349 N.L.R.B. No. 70, at *5. The compliance specification alleged that the corporations and Heller should be held jointly and severally liable for the backpay award against Bolivar because the corporations constituted a single employer[2] and because the corporate veil should be pierced to allow collection from Heller personally. An ALJ conducted a hearing regarding the allegations of the compliance specification and recommended that all five respondents be held jointly and severally liable for the award against Bolivar. On April 12, 2007, the Board issued the Order adopting the ALJ's recommendation.

Pursuant to 29 U.S.C. § 160(e), the Board filed a petition in this court for the enforcement of its Order. Heller challenged the Board's decision to pierce the corporate veil, but the corporate respondents did not contest the Board's decision that the four corporations constitute a single employer. "The Board is entitled to summary enforcement of the uncontested portions of its order." *Flying Food Group, Inc. v. NLRB*, 471 F.3d 178, 181 (D.C. Cir. 2006); *accord NLRB v. MDI Commercial Servs.*, 175 F.3d 621, 624 (8th Cir. 1999). We therefore summarily enforce the Order with respect to the single employer holding. Because the Board's uncontested findings allow us to treat Screen Creations, Bolivar, Screen Creations de Mexico, and Screen

[2]"The single employer doctrine is a Board creation that treats two or more related enterprises as a single employer for purposes of holding the enterprises jointly . . . liab[le] for any unfair labor practices." *Iowa Express Distrib., Inc. v. NLRB*, 739 F.2d 1305, 1310 (8th Cir. 1984).

Creations de Celaya as a single employer, we consider the evidence involving all of the corporations in deciding whether the Board's order piercing the corporate veil to allow collection from Heller was appropriate. *See MDI Commercial Servs.*, 175 F.3d at 624; *Radisson Plaza Minneapolis v. NLRB*, 987 F.2d 1376, 1381-82 (8th Cir. 1993).

## II.    DISCUSSION

"We will enforce the Board's order if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole," *Wal-Mart Stores, Inc. v. NLRB*, 400 F.3d 1093, 1097 (8th Cir. 2005), "even if we might have reached a different decision on de novo review," *NLRB v. Rockline Indus., Inc.*, 412 F.3d 962, 966 (8th Cir. 2005). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. La-Z-Boy Midwest*, 390 F.3d 1054, 1058 (8th Cir. 2004). However, "[i]n considering whether substantial evidence supports the Board's decision, we must take into account whatever in the record fairly detracts from its weight." *MDI Commercial Servs.*, 175 F.3d at 630 (internal quotations omitted).

"The corporate structure is an artificial construct of the law, a substantial purpose of which is to create an incentive for investment by limiting [a shareholder's] exposure to personal liability" for the corporation's debts and obligations. *NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993). "In extreme circumstances, . . . the corporate form will be disregarded and the personal assets of a controlling shareholder or shareholders may be attached in order to satisfy the debts and liabilities of the corporation." *Id.* However, courts should "only reluctantly and cautiously" pierce the corporate veil, and the "veil may not be pierced absent a showing of improper conduct." *Id.* "[T]he party who wishes to pierce the corporate veil bears the burden of proving that there are substantial reasons for doing so."

*Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan v. Hroch*, 757 F.2d 184, 190 (8th Cir. 1985).

Whether a shareholder can be personally liable for a corporation's financial obligations resulting from its unfair labor practice under the NLRA "is a question of federal law [because] it arises in the context of a federal labor dispute." *NLRB v. Fullerton Transfer & Storage Ltd.*, 910 F.2d 331, 335 (6th Cir. 1990); *accord White Oak Coal Co.*, 318 N.L.R.B. 732, 734 (1995), *enforced*, 81 F.3d 150 (4th Cir. 1996). Although Congress did not provide specifically for shareholder liability for violations of the NLRA, federal courts have pierced the corporate veil to hold shareholders liable for violations of federal statutes, including the NLRA. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61-64 (1998); *Anderson v. Abbott*, 321 U.S. 349, 358 (1944); *Minn. Laborers Health & Welfare Fund v. Scanlan*, 360 F.3d 925, 928 (8th Cir. 2004); *Hroch*, 757 F.2d at 190-91; *Bufco Corp. v. NLRB*, 147 F.3d 964, 969 (D.C. Cir. 1998). We have adopted the following two-prong test as the "federal common law standard,"[3] *Scanlan*, 360 F.3d at 928, for piercing the corporate veil: "(i) was there such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct, and (ii) would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations." *Id.* (quoting *Greater Kan. City Roofing*, 2 F.3d at 1052).[4]

_____

[3]The Supreme Court has noted that there is "significant disagreement among courts and commentators" regarding whether federal courts should "apply a federal common law" or "borrow state law" when piercing the corporate veil to attach shareholder liability for a corporation's violation of a federal law. *Bestfoods*, 524 U.S. at 63 n.9.

[4]Although the term "alter ego" is commonly employed in the context with piercing of the corporate veil, a distinct "alter ego doctrine" has developed under the NLRA, which "involves a more lenient standard for disregarding the corporate form than that employed in corporate law." *Greater Kan. City Laborers Pension Fund v.*

When assessing the first prong to determine whether the shareholders and the corporation have failed to maintain their separate identities, "we consider . . . the degree to which the corporate legal formalities have been maintained, and . . . the degree to which individual and corporate assets and affairs have been commingled." *Greater Kan. City Roofing*, 2 F.3d at 1052. A non-exhaustive list of factors we will consider to make this determination include:

> (1) whether the corporation is operated as a separate entity; (2) the commingling of funds and other assets; (3) the failure to maintain adequate corporate records; (4) the nature of the corporation's ownership and control; (5) the availability and use of corporate assets, the absence of same, or under capitalization; (6) the use of the corporate form as a mere shell, instrumentality or conduit of an individual or another corporation; (7) disregard of corporate legal formalities and the failure to maintain an arm's-length relationship among related entities; (8) diversion of the corporate funds or assets to noncorporate purposes; and . . . (9) transfer or disposal of corporate assets without fair consideration.

*White Oak Coal Co.*, 318 N.L.R.B. at 735; *accord Greater Kan. City Roofing*, 2 F.3d at 1052 n.6. No one factor is determinative, and not all of the these factors must be present.

When assessing the second prong to determine whether adherence to the corporate fiction would sanction a fraud, promote injustice or lead to an evasion of

---

*Super. Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997) (internal quotations and citations omitted). The NLRB's "alter ego doctrine focuses on whether one business entity should be held to the labor obligations of another business entity that has discontinued operations." *Iowa Express*, 739 F.2d at 1310. However, piercing of the corporate veil to attach liability to a shareholder is a doctrine of corporate law and is distinct from the alter ego doctrine developed under the NLRA. *See Bestfoods*, 524 U.S. at 61-63; *Scanlan*, 360 F.3d at 927-28.

legal obligations, we consider causation and culpability. *See Greater Kan. City Roofing*, 2 F.3d at 1052-55. A corporation's inability to pay its debt alone is not sufficient to support a finding of injustice. *Id.* at 1053; *see Hroch*, 757 F.2d at 191. "It is only when the shareholders disregard the separateness of the corporate identity *and when that act of disregard causes the injustice or inequity or constitutes the fraud* that the corporate veil may be pierced." *Greater Kan. City Roofing*, 2 F.3d at 1053 (emphasis in original). Additionally, the shareholders who will be held personally liable for the corporation's debt must share in some level of culpability for the injustice. *Id.*

With respect to the first prong, substantial evidence supports the Board's finding that Heller and the corporations failed to maintain their separate identities. First, Heller controlled and owned all four corporations, and he directed the decision-making of each corporation. Second, Heller did not operate Bolivar and Screen Creations as separate entities. Screen Creations' insurance plan covered Bolivar's assets and its profit-sharing plan included Bolivar's employees. More importantly, Heller kept Screen Creations profitable in part by rendering Bolivar unprofitable. Screen Creations was Bolivar's sole customer, but Bolivar neither charged enough to cover its basic operating costs nor attempted to expand its customer base. Heller also received his salary from Screen Creations and not Bolivar. As a result, Heller's salary was tied to Screen Creations' profitability and not Bolivar's profitability.

Third, Heller and the corporations readily commingled funds, failed to maintain adequate corporate records, disregarded corporate legal formalities, and failed to maintain an arm's-length relationship. The funds used to purchase Bolivar's initial equipment came from Screen Creations through Heller. Although Screen Creations, Bolivar and Heller exchanged promissory notes, neither Bolivar nor Heller ever made any payments on the notes, and neither Heller nor Screen Creations ever attempted to enforce them in any way. Heller effectively prevented Bolivar from making payments on the promissory note because he did not allow Bolivar to charge Screen Creations

enough to cover its operating costs. Moreover, Screen Creations advanced operating funds to Bolivar without any real accounting or any formal agreement for return payments. In fact, outside the yearly tax returns, the corporations failed to document and account for the transactions between them adequately. As a result, the two corporations' tax returns reflected different amounts for Bolivar's debt to Screen Creations.[5] According to Screen Creations' 2001 tax return, Bolivar owed Screen Creations $306,071 at the beginning of the tax year and $103,330 at the end of the tax year. According to Bolivar's 2001 tax return, Bolivar owed Screen Creations $202,741 at the beginning of the tax year and $80,168 at the end of the tax year. Thus, Heller readily commingled funds between the two corporations and failed to follow normal legal formalities.

Finally, Heller disposed of Bolivar's corporate assets without fair consideration. Screen Creations de Mexico and Confecciones have never paid compensation for the use of Bolivar's equipment, and no appraisal of the equipment occurred before the transfer of Bolivar's assets to Screen Creations. Instead, Heller and his accountant arrived at the sale price of $225,000, for equipment insured for $550,000 and purchased for $671,218, after a discussion of "various scenarios." Additionally, no corporate records document the sale of Bolivar's assets to Screen Creations. Even if the $225,000 sale price did reflect the fair market value for the equipment, $102,427 of the sale proceeds was never realized by Bolivar, according to its 2001 tax return. Although Heller asserts that Screen Creations must have advanced an additional $102,427 during the 2001 tax year, he did not provide any documentation of such advances. Screen Creations' 2001 tax return also does not reflect such an advance.[6]

[5]Heller testified that the amount "due from affiliated companies" on Screen Creations' tax returns reflected the amount Bolivar owed Screen Creations. Heller also testified that the "due to affiliate" on Bolivar's tax returns reflected the amount Bolivar owed Screen Creations.

[6]According to Screen Creations' 2001 tax return, Bolivar's debt at the beginning of the tax year was $306,071. Had Screen Creations reduced this debt by

-11-

Thus, neither Screen Creations' nor Bolivar's tax returns substantiate Heller's assertions. The failure to operate as a separate entity, to maintain adequate corporate records, to maintain an arm's-length relationship, to maintain corporate legal formalities, to avoid the commingling of funds, and to avoid the disposal of corporate assets without fair consideration provide substantial evidence to support a finding that corporate legal formalities were not maintained and that the assets and affairs of Heller and his corporations were indistinct. Therefore, substantial evidence supports the Board's finding that Heller and the corporations have failed to maintain their separate identities.[7]

---

the full sale price of $225,000, then Bolivar's debt would have been $81,071. Had Screen Creations then advanced an additional $102,427 as Heller asserted, Bolivar's debt would have increased to $183,498. However, Screen Creations' 2001 tax return shows that Bolivar's debt was $103,330 at the end of the tax year, reflecting a possible advance of no more than $22,259. Screen Creations' tax returns do not indicate an advance to Bolivar of $102,427.

[7]The Board found that Heller grossly undercapitalized Bolivar. Because no evidence was provided of the level of capitalization at the time of incorporation, we do not look at the adequacy of capitalization in this case. The adequacy of capitalization must be measured at the time of incorporation because it reveals whether the corporation was created to avoid liability. *See* 1 William Meade Fletcher et. al., Fletcher Cyclopedia of the Law of Private Corporations § 41.33, at 652 (perm. ed., rev. vol. 1999); Harry G. Henn & John R. Alexander, Laws of Corporations and Other Business Enterprises § 146, at 349 & n.21 (3d ed. 1983); *see also J-R Grain Co. v. FAC, Inc.*, 627 F.2d 129, 135 (8th Cir. 1980) (finding that inadequate capitalization is to be determined at the time of incorporation under the common law and applying it to Nebraska law). Inadequate capitalization after incorporation is generally relevant if the capital was removed as part of a fraudulent conveyance scheme. In such a scheme, the inappropriate transfer of assets and not the level of capitalization would be the prevailing factor in determining whether to pierce the corporate veil. *See* Robert Charles Clark, *The Duties of the Corporate Debtor to its Creditors*, 90 Harv. L. Rev. 505, 544 (1977); *see also* Stephen B. Presser, Piercing the Corporate Veil §§ 1:8-1:9 (2004) (providing an in-depth comparison of the inadequate capitalization theory and the fraudulent conveyance theory to piercing the corporate veil).

With respect to the second prong, substantial evidence supports the Board's finding that adherence to the corporate fiction would sanction a fraud or lead to an evasion of a legal obligation. In addition to providing substantial evidence of the first prong, Heller's transfer of Bolivar's assets provides substantial evidence to support a finding under the second prong that Heller fraudulently removed Bolivar's assets to avoid Bolivar's legal obligations to the five discriminatees. Although Screen Creations insured Bolivar's equipment for $550,000, Heller, without a formal assessment of the value of the equipment originally purchased for $671,218, supposedly sold the same equipment for $225,000. Even if the $225,000 sale price reflected the fair market value of Bolivar's equipment, Bolivar's 2001 tax return also reveals that Bolivar never received approximately forty-five percent of the proceeds. This missing $102,427 could have been available to satisfy the entire backpay award against Bolivar or, according to Bolivar's accounting, could have paid all of Bolivar's debt to Screen Creations and approximately a quarter of the backpay award. Additionally, with the equipment in Mexico, the possibility of attachment of Bolivar's assets became significantly more difficult, if not impossible. The arrangement also benefitted Heller because his corporation, Screen Creations de Mexico, received the equipment for free at the expense of Bolivar and the discriminatees.

In addition to removing all of Bolivar's assets, Heller prevented Bolivar from becoming profitable. Bolivar did not charge enough to cover its operating costs. As a result, Screen Creations was able to have greater profitability, and Heller could draw his salary from Screen Creations. Thus, it was at least reasonable for the Board to conclude that Heller's transfer of Bolivar's assets and the allocation of all profits to Screen Creations purposely caused Bolivar to lack the resources to satisfy the award. Therefore, substantial evidence exists to support a finding that adherence to the corporate fiction would sanction a fraud and lead to the evasion of a legal obligation.

Heller argues that substantial evidence does not support a finding that he had the requisite culpability to justify piercing the corporate veil.[8] Heller first claims that his case is similar to *Greater Kansas City Roofing*. In *Greater Kansas City Roofing*, the Tenth Circuit held that Tina Clarke did not have sufficient culpability to justify piercing the corporate veil. 2 F.3d at 1055. Clarke's brother and sister-in-law owned Greater Kansas City Roofing ("GKC"), a corporation that was ordered to make payments to remedy its unfair labor practices. *Id.* at 1049. When the company began to struggle financially, Clarke provided personal loans to GKC. *Id.* at 1050. Upon realizing that GKC would not survive, Clarke incorporated New Greater Kansas City Roofing and obtained the assets of GKC through a transfer in lieu of foreclosure. *Id.* The Tenth Circuit held that although Clarke had not maintained many corporate formalities, the Board could not pierce the corporate veil because she was unaware of the judgment against GKC for unfair labor practices when she obtained GKC's assets. *Id.* at 1055. Unlike Clarke, however, Heller knew of the findings against Bolivar for unfair labor practices and of the ALJ's decision that Bolivar provide backpay to the five discriminatees. The ALJ issued the decision on September 24, 1998. Although the ALJ did not specify the exact amount that Bolivar owed the discriminatees, Heller easily could have calculated the amount owed based on the formula that the ALJ provided in the order. While the ALJ's decision was pending before the Board, Heller

_____

[8]There has been some debate as to the level of culpability required to pierce the corporate veil. *Compare Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir. 1979) (requiring a showing of fraudulent intent), *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 85 F.3d 1282, 1288 (7th Cir. 1996) (same), *and Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 38 (1st Cir. 2000) (Stahl, J., dissenting) (same), *with Trs. of the Nat.'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) (holding that fraudulent intent not required for piercing the corporate veil), *and Thomas v. Peacock*, 39 F.3d 493, 504 n.16 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 349 (1996) (stating that proof of fraud is not a necessary element to disregard the corporate entity). We need not decide, at this time, the exact level of culpability required because we conclude that substantial evidence supports a finding that Heller had the highest level of culpability, the intent to defraud.

-14-

began moving Bolivar's assets to Mexico in 1999 and finished transferring assets to Screen Creations by January 1, 2001, the date of sale as recorded in Bolivar's tax return. Bolivar also ceased operations a month before the Board issued its decision adopting the ALJ's recommendations. Thus, this case is distinguishable from *Greater Kansas City Roofing*.

Second, Heller argues that his infusion of personal assets into Bolivar and Screen Creations belies any attempt on his part to avoid paying the discriminatees by fraudulently removing Bolivar's assets. Other than the initial $170,000 provided to Bolivar to purchase equipment, the funding of which actually came from Screen Creations, Heller never provided any funds to Bolivar. Although Heller made loans to Screen Creations, Screen Creations was not liable to the five discriminatees unless the single employer doctrine applied, which Heller would not have foreseen at the time. Additionally, Heller only loaned Screen Creations money after he guaranteed that Screen Creations would not be profitable. Heller had moved all of Screen Creations' equipment to Screen Creations de Celaya and did not charge Screen Creations de Celaya for the equipment's use. Heller also ceased Screen Creations' production work and made it into a service business; however, Screen Creations never charged Screen Creations de Celaya for the services it rendered. Also, although Heller loaned Screen Creations approximately $300,000, he received an average annual salary of $120,000 during these years. Hence, Heller's loaning money to Screen Creations does not sufficiently undermine our conclusion that substantial evidence supports a finding that Heller attempted to avoid paying the discriminatees by fraudulently removing Bolivar's assets.

Finally, Heller argues that he moved Bolivar's assets to Mexico because of NAFTA and not because he intended to defraud anyone. Although economic conditions can provide a legitimate reason for transferring assets, substantial evidence supports a finding that the structure, manner and timing of the equipment transfer here suggested otherwise. Bolivar could have simply moved its assets to Screen Creations

de Mexico and maintained title over the equipment, similar to the arrangement between Screen Creations and Screen Creations de Celaya. Rather, Bolivar transferred all of its assets to Screen Creations without proper documentation and full compensation. Therefore, substantial evidence exists to conclude that the transfer of assets was intended to avoid Bolivar's legal obligations to the five discriminatees.

We do not doubt that Heller presented some evidence that weighs against the Board's decision to pierce the corporate veil. Indeed, we may have reached a different conclusion on de novo review. However, Heller's arguments do not detract from the substantial evidence in the record as a whole that supports a finding that Heller intended to avoid Bolivar's legal obligations to the five discriminatees by fraudulently removing the corporation's assets.

## III. CONCLUSION

We conclude that the Board did not err in piercing the corporate veil because substantial evidence exists to support the Board's findings (i) that Heller and the corporations' assets were indistinct and (ii) that adherence to the corporate fiction would sanction a fraud, promote injustice or lead to an evasion of legal obligations. Accordingly, we enforce the Board's Order holding Bolivar, Screen Creations, Screen Creations de Mexico, Screen Creations de Celaya and Heller jointly and severally liable.

_____